(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AIR WISCONSIN AIRLINES CORP. *v.* HOEPER

### CERTIORARI TO THE SUPREME COURT OF COLORADO

No. 12–315.  Argued December 9, 2013—Decided January 27, 2014

Respondent Hoeper was a pilot for petitioner Air Wisconsin Airlines Corp.  When Air Wisconsin stopped flying from Hoeper's home base on aircraft that he was certified to fly, he needed to become certified on a different type of aircraft to keep his job.  After Hoeper failed in his first three attempts to gain certification, Air Wisconsin agreed to give him a fourth and final chance.  But he performed poorly during a required training session in a simulator.  Hoeper responded angrily to this failure—raising his voice, tossing his headset, using profanity, and accusing the instructor of "railroading the situation."

   The instructor called an Air Wisconsin manager, who booked Hoeper on a flight from the test location to Hoeper's home in Denver.  Several hours later, the manager discussed Hoeper's behavior with other airline officials.  The officials discussed Hoeper's outburst, his impending termination, the history of assaults by disgruntled airline employees, and the chance that—because Hoeper was a Federal Flight Deck Officer (FFDO), permitted "to carry a firearm while engaged in providing air transportation," 49 U. S. C. §44921(f)(1)—he might be armed.  At the end of the meeting, an airline executive made the decision to notify the Transportation Security Administration (TSA) of the situation.  The manager who had received the initial report from Hoeper's instructor made the call to the TSA.  During that call, according to the jury, he made two statements: first, that Hoeper "was an FFDO who may be armed" and that the airline was "concerned about his mental stability and the whereabouts of his firearm"; and second, that an "[u]nstable pilot in [the] FFDO program was terminated today."  In response, the TSA removed Hoeper from his plane, searched him, and questioned him about the location of his gun.  Hoeper eventually boarded a later flight to Denver, and Air Wisconsin fired him the next day.

Syllabus

Hoeper sued for defamation in Colorado state court. Air Wisconsin moved for summary judgment and later for a directed verdict, relying on the Aviation and Transportation Security Act (ATSA), which grants airlines and their employees immunity against civil liability for reporting suspicious behavior, 49 U. S. C. §44941(a), except where such disclosure is "made with actual knowledge that the disclosure was false, inaccurate, or misleading" or "made with reckless disregard as to the truth or falsity of that disclosure," §44941(b). The trial court denied the motions and submitted the ATSA immunity question to the jury. The jury found for Hoeper on the defamation claim. The State Supreme Court affirmed. It held that the trial court erred in submitting the immunity question to the jury but that the error was harmless. Laboring under the assumption that even true statements do not qualify for ATSA immunity if they are made recklessly, the court held that Air Wisconsin was not entitled to immunity because its statements to the TSA were made with reckless disregard of their truth or falsity.

*Held*:

1. ATSA immunity may not be denied to materially true statements. Pp. 7–11.

(a) The ATSA immunity exception is patterned after the actual malice standard of *New York Times Co.* v. *Sullivan*, 376 U. S. 254, which requires material falsity. See, *e.g.*, *Masson* v. *New Yorker Magazine, Inc.*, 501 U. S. 496, 517. Because the material falsity requirement was settled when the ATSA was enacted, Congress presumably meant to incorporate it into the ATSA's immunity exception and did not mean to deny ATSA immunity to true statements made recklessly. This presumption is not rebutted by other indicia of statutory meaning. Section 44941(b)(1) requires falsity, and §44941(b)(2) simply extends the immunity exception from knowing falsehoods to reckless ones. Denying immunity for substantially true reports, on the theory that the person making the report had not yet gathered enough information to be certain of its truth, would defeat the purpose of ATSA immunity: to ensure that air carriers and their employees do not hesitate to provide the TSA with needed information. Pp. 7–10.

(b) Hoeper's arguments that the State Supreme Court's judgment should be affirmed notwithstanding its misapprehension of ATSA's immunity standard are unpersuasive. Hoeper claims that Air Wisconsin did not argue the truth of its statements in asserting immunity, but Air Wisconsin contended in the state court that ATSA's immunity exception incorporates the *New York Times* actual malice standard, which requires material falsity. And the State Supreme Court did not perform the requisite analysis of material falsity in

finding the record sufficient to support the defamation verdict. A court's deferential review of jury findings cannot substitute for its own analysis of the record; the jury was instructed only to determine falsity, not materiality; and applying the material falsity standard to a defamation claim is quite different from applying it to ATSA immunity. Pp. 10–11.

2. Under the correct material falsity analysis, Air Wisconsin is entitled to immunity as a matter of law. Pp. 12–18.

(a) In the defamation context, a materially false statement is one that "'would have a different effect on the mind of the reader [or listener] from that which the . . . truth would have produced.'" *Masson*, 501 U. S., at 517. This standard suffices in the ATSA context as well, so long as the hypothetical reader or listener is a security officer. For purposes of ATSA immunity, a falsehood cannot be material absent a substantial likelihood that a reasonable security officer would consider it important in determining a response to the supposed threat. Pp. 12–13.

(b) Viewing the evidence in the light most favorable to Hoeper, the Court concludes as a matter of law that any falsehoods in Air Wisconsin's statement to the TSA were not material. First, the Court rejects Hoeper's argument that Air Wisconsin should have qualified its statement that Hoeper "was an FFDO who may be armed" by noting that it had no reason to think he actually was armed. To the extent that Air Wisconsin's statement could have been confusing, any such confusion is immaterial, as a reasonable TSA officer—having been told that Hoeper was an FFDO who was upset about losing his job—would have wanted to investigate whether he was armed. To demand more precise wording would vitiate the purpose of ATSA immunity: to encourage air carriers and their employees, often in fast-moving situations and with little time to fine-tune their diction, to provide the TSA immediately with information about potential threats. Second, Air Wisconsin's statement that Hoeper "was terminated today" was not materially false. While Hoeper had not actually been fired at the time of the statement, everyone involved knew that his firing was imminent. No reasonable TSA officer would care whether an angry, potentially armed airline employee had just been fired or merely knew he was about to meet that fate. Finally, although the details of Hoeper's behavior during the simulator session may be disputed, it would have been correct even under Hoeper's version of the facts for Air Wisconsin to report that Hoeper "blew up" during the test. From a reasonable security officer's perspective, there is no material difference between a statement that Hoeper had "blown up" in a professional setting and a statement that he was unstable. Air Wisconsin's related statement that it was "concerned

Syllabus

about [Hoeper's] mental stability" is no more troubling. Many of the officials who attended the meeting at airline headquarters might not have framed their concerns in terms of "mental stability," but it would be inconsistent with the ATSA's text and purpose to expose Air Wisconsin to liability because the manager who placed the call to the TSA could have chosen a slightly better phrase to articulate the airline's concern. A statement that would otherwise qualify for ATSA immunity cannot lose that immunity because of some minor imprecision, so long as "the gist" of the statement is accurate, *Masson*, 501 U. S., at 517. Pp. 13–18.

Reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and ALITO, JJ., joined, and in which SCALIA, THOMAS, and KAGAN, JJ., joined as to Parts I, II, and III–A. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which THOMAS and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–315

AIR WISCONSIN AIRLINES CORPORATION, PETITIONER *v.* WILLIAM L. HOEPER

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF COLORADO

[January 27, 2014]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In 2001, Congress created the Transportation Security Administration (TSA) to assess and manage threats against air travel. Aviation and Transportation Security Act (ATSA), 49 U. S. C. §44901 *et seq.* To ensure that the TSA would be informed of potential threats, Congress gave airlines and their employees immunity against civil liability for reporting suspicious behavior. §44941(a). But this immunity does not attach to "any disclosure made with actual knowledge that the disclosure was false, inaccurate, or misleading" or "any disclosure made with reckless disregard as to the truth or falsity of that disclosure." §44941(b).

The question before us is whether ATSA immunity may be denied under §44941(b) without a determination that a disclosure was materially false. We hold that it may not. Because the state courts made no such determination, and because any falsehood in the disclosure here would not have affected a reasonable security officer's assessment of the supposed threat, we reverse the judgment of the Colorado Supreme Court.

I

A

William Hoeper joined Air Wisconsin Airlines Corporation as a pilot in 1998.  But by late 2004, Air Wisconsin had stopped operating flights from Denver, Hoeper's home base, on any type of aircraft for which he was certified.  To continue flying for Air Wisconsin out of Denver, Hoeper needed to gain certification on the British Aerospace 146 (BAe-146), an aircraft he had not flown.

Hoeper failed in his first three attempts to pass a proficiency test.  After the third failure, as he later acknowledged at trial, his employment was "at [Air Wisconsin's] discretion."  App. 193.  But he and Air Wisconsin entered into an agreement to afford him "one more opportunity to pass [the] proficiency check."  *Id.,* at 426.  The agreement left little doubt that Hoeper would lose his job if he failed again.

In December 2004, Hoeper flew from Denver to Virginia for simulator training as part of this final test.  During the training, Hoeper failed to cope with a challenging scenario created by the instructor, Mark Schuerman, and the simulator showed the engines "flam[ing] out" due to a loss of fuel.  App. 203.  As Schuerman began to tell Hoeper that he "should know better," *ibid.,* Hoeper responded angrily.  He later described what happened:

> "At this point, that's it.  I take my headset off and I toss it up on the glare shield. . . .  [Schuerman] and I exchanged words at the same elevated decibel level.  Mine went something like this: This is a bunch of shit.  I'm sorry.  You are railroading the situation and it's not realistic."  *Id.,* at 203–204.

When Hoeper announced that he wanted to call the legal department of the pilots' union, Schuerman ended the session so that Hoeper could do so.  Schuerman then reported Hoeper's behavior to Patrick Doyle, the Wisconsin-

based manager of the BAe-146 fleet. Doyle booked Hoeper on a United Airlines flight back to Denver.

Several hours after Schuerman's report, Doyle discussed the situation at Air Wisconsin's headquarters with the airline's Vice President of Operations, Kevin LaWare; its Managing Director of Flight Operations, Scott Orozco; and its Assistant Chief Pilot, Robert Frisch. LaWare later explained the accretion of his concerns about what Hoeper might do next. He regarded Hoeper's behavior in the simulator as "a fairly significant outburst," of a sort that he "hadn't seen . . . before." *Id.,* at 276. And he knew "it was a given that . . . Hoeper's employment was . . . going to be terminated" as a result of his failure to complete the simulator training. *Id.,* at 278.

Then, LaWare testified, Orozco mentioned that Hoeper was a Federal Flight Deck Officer (FFDO). The FFDO program allows the Government to "deputize volunteer pilots of air carriers . . . to defend the flight decks of aircraft . . . against acts of criminal violence or air piracy." §44921(a). FFDOs are permitted "to carry a firearm while engaged in providing air transportation." §44921(f)(1). Hoeper had become an FFDO earlier in 2004 and had been issued a firearm. He was not allowed to carry the firearm during his trip to the training facility, because he was not "engaged in providing air transportation," *ibid.* But according to one official at the meeting, the Denver airport's security procedures made it possible for crew members to bypass screening, so that Hoeper could have carried his gun despite the rule. Indeed, Frisch later testified that he was "aware of one" incident in which an Air Wisconsin pilot had come to training with his FFDO weapon. App. 292. On the basis of this information, LaWare concluded, there was "no way . . . to confirm" whether "Hoeper had his weapon with him, even though . . . by policy, [he was] not supposed to have it with him." *Id.,* at 279.

Finally, LaWare testified, he and the other Air Wiscon-

sin officials discussed two prior episodes in which disgruntled airline employees had lashed out violently. *Id.,* at 280. In one incident, a FedEx flight engineer under investigation for misconduct "entered the cockpit" of a FedEx flight "and began attacking the crew with a hammer" before being subdued. *United States* v. *Calloway*, 116 F. 3d 1129, 1131 (CA6 1997). In another, a recently fired ticket agent brought a gun onto a Pacific Southwest Airlines flight and shot his former supervisor and the crew, leading to a fatal crash. Malnic, Report Confirms That Gunman Caused 1987 Crash of PSA Jet, L. A. Times, Jan. 6, 1989, p. 29.

In light of all this—Hoeper's anger, his impending termination, the chance that he might be armed, and the history of assaults by disgruntled airline employees—LaWare decided that the airline "need[ed] to make a call to the TSA," to let the authorities know "the status" of the situation. App. 282.

Doyle offered to make the call. According to the jury, he made two statements to the TSA: first, that Hoeper "was an FFDO who may be armed" and that the airline was "concerned about his mental stability and the whereabouts of his firearm"; and second, that an "[u]nstable pilot in [the] FFDO program was terminated today." App. to Pet. for Cert. 111a. (The latter statement appears in the record as the subject line of an internal TSA e-mail, summarizing the call from Doyle. App. 414.)

The TSA responded to the call by ordering that Hoeper's plane return to the gate. Officers boarded the plane, removed Hoeper, searched him, and questioned him about the location of his gun. When Hoeper stated that the gun was at his home in Denver, a Denver-based federal agent went there to retrieve it.

Later that day, Hoeper boarded a return flight to Denver. Air Wisconsin fired him the following day.

## B

Hoeper sued Air Wisconsin in Colorado state court on several claims, including defamation.[1] Air Wisconsin moved for summary judgment on the basis of ATSA immunity,[2] but the trial court denied it, ruling that the jury was entitled to find the facts pertinent to immunity. The case went to trial, and the court denied Air Wisconsin's motion for a directed verdict on the same basis. It submitted the question of ATSA immunity to the jury, with the instruction—following the language of §44941(b)—that immunity would not apply if Hoeper had proved that Air Wisconsin "made the disclosure [to the TSA] with actual knowledge that the disclosure was false, inaccurate, or misleading" or "with reckless disregard as to its truth or falsity." App. 582. The jury instructions did not state that ATSA immunity protects materially true statements.

The jury found for Hoeper on the defamation claim and awarded him $849,625 in compensatory damages and $391,875 in punitive damages. The court reduced the latter award to $350,000, for a total judgment of just under $1.2 million, plus costs.

The Colorado Court of Appeals affirmed. 232 P. 3d 230 (2009). It held "that the trial court properly submitted the ATSA immunity issue to the jury," that "the record sup-

_____

[1] Air Wisconsin agrees that it bears responsibility for Doyle's statements. 2012 WL 907764, *2, *16, n. 2 (Colo., Mar. 19, 2012).

[2] The ATSA immunity provision specifies that "[a]ny air carrier . . . or any employee of an air carrier . . . who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism, . . . to any employee or agent of the Department of Transportation, the Department of Justice, any Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, for such disclosure." 49 U. S. C. §44941(a).

ports the jury's rejection of immunity," and that the evidence was sufficient to support the jury's defamation verdict. *Id.,* at 233.

The Colorado Supreme Court affirmed. 2012 WL 907764 (Mar. 19, 2012). It began by holding, contrary to the lower courts, "that immunity under the ATSA is a question of law to be determined by the trial court before trial." *Id.,* at *4. But it concluded that the trial court's error in submitting immunity to the jury was "harmless because Air Wisconsin is not entitled to immunity." *Id.,* at *6. In a key footnote, the court stated: "In our determination of immunity under the ATSA, we need not, and therefore do not, decide whether the statements were true or false. Rather, we conclude that Air Wisconsin made the statements with reckless disregard as to their truth or falsity." *Id.,* at *16, n. 6. The court thus appears to have labored under the assumption that even true statements do not qualify for ATSA immunity if they are made recklessly.

Applying this standard, and giving "no weight to the jury's finding[s]," *ibid.,* n. 5, the court held that "[a]lthough the events at the training may have warranted a report to TSA," Air Wisconsin's statements "overstated those events to such a degree that they were made with reckless disregard of their truth or falsity." *Id.*, at *7. The court opined that Air Wisconsin "would likely be immune under the ATSA if Doyle had reported that Hoeper was an Air Wisconsin employee, that he knew he would be terminated soon, that he had acted irrationally at the training three hours earlier and 'blew up' at test administrators, and that he was an FFDO pilot." *Id.,* at *8. But because Doyle actually told TSA "(1) that he believed Hoeper to be mentally unstable; (2) that Hoeper had been terminated earlier that day; and (3) that Hoeper may have been armed," *id.,* at *7, the court determined that his statements "went well beyond" the facts and did not qualify for

immunity, *id.,* at \*8. The court went on to conclude that the evidence was sufficient to support the jury's defamation verdict.

Justice Eid, joined by two others, dissented in part. She agreed with the majority's holding that immunity is an issue for the court, not the jury. But she reasoned that Air Wisconsin was entitled to immunity "because [its] statements to the TSA were substantially true." *Id.,* at \*11.

We granted certiorari to decide "[w]hether ATSA immunity may be denied without a determination that the air carrier's disclosure was materially false." 570 U. S. ___ (2013).

## II
## A

Congress patterned the exception to ATSA immunity after the actual malice standard of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and we have long held that actual malice requires material falsity. Because we presume that Congress meant to incorporate the settled meaning of actual malice when it incorporated the language of that standard, we hold that a statement otherwise eligible for ATSA immunity may not be denied immunity unless the statement is materially false.

In *New York Times*, we held that under the First Amendment, a public official cannot recover "for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.,* at 279– 280. Congress borrowed this exact language in denying ATSA immunity to "(1) any disclosure made with actual knowledge that the disclosure was false, inaccurate, or misleading; or (2) any disclosure made with reckless disregard as to the truth or falsity of that disclosure." §44941(b).

One could in principle construe the language of the actual malice standard to cover true statements made recklessly. But we have long held, to the contrary, that actual malice entails falsity. See, *e.g., Philadelphia News-papers, Inc.* v. *Hepps*, 475 U. S. 767, 775 (1986) ("[A]s one might expect given the language of the Court in *New York Times*, a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation" (citation omitted)); *Garrison* v. *Louisiana*, 379 U. S. 64, 74 (1964) ("We held in *New York Times* that a public official might be allowed the civil remedy only if he establishes that the utterance was false").

Indeed, we have required more than mere falsity to establish actual malice: The falsity must be "material." *Masson* v. *New Yorker Magazine, Inc.*, 501 U. S. 496, 517 (1991). As we explained in *Masson*, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Ibid.* A "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Ibid.* (quoting R. Sack, Libel, Slander, and Related Problems 138 (1980)).

These holdings were settled when Congress enacted the ATSA, and we therefore presume that Congress meant to adopt the material falsity requirement when it incorporated the actual malice standard into the ATSA immunity exception. "[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." *FAA* v. *Cooper*, 566 U. S. ___, ___ (2012) (slip op., at 6) (internal quotation marks omitted). The actual malice standard does not cover materially true statements made recklessly, so we presume that Congress did not mean to deny ATSA immunity to such statements.

Other indicia of statutory meaning could rebut this

presumption, but here, they do not. First, the ATSA's text favors a falsity requirement. The first subsection of §44941(b) requires falsity, as a true disclosure cannot have been made "with actual knowledge" that it "was false." The only question is whether the second subsection— which denies immunity to "any disclosure made with reckless disregard as to [its] truth or falsity"—similarly requires falsity. We conclude that it does. The second subsection simply extends the immunity exception from knowing falsehoods to reckless ones, ensuring that an air carrier cannot avoid liability for a baseless report by sticking its head in the sand to avoid "actual knowledge" that its statements are false. "[T]he defense of truth . . . , even if not explicitly recognized, . . .is implicit in . . . a standard of recovery that rests on knowing or reckless disregard of the truth." *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 498–499 (1975) (Powell, J., concurring).

A material falsity requirement also serves the purpose of ATSA immunity. The ATSA shifted from airlines to the TSA the responsibility "for assessing and investigating possible threats to airline security." 2012 WL 907764, *14 (Eid, J., concurring in part and dissenting in part). In directing the TSA to "receive, assess, and distribute intelligence information related to transportation security," 49 U. S. C. §114(f)(1), Congress wanted to ensure that air carriers and their employees would not hesitate to provide the TSA with the information it needed. This is the purpose of the immunity provision, evident both from its context and from the title of the statutory section that contained it: "encouraging airline employees to report suspicious activities." ATSA §125, 115 Stat. 631 (capitalization and boldface type omitted). It would defeat this purpose to deny immunity for substantially true reports, on the theory that the person making the report had not yet gathered enough information to be certain of its truth. Such a rule would restore the pre-ATSA state of affairs, in

which air carriers bore the responsibility to investigate and verify potential threats.

We therefore hold that ATSA immunity may not be denied under §44941(b) to materially true statements. This interpretation of the statute is clear enough that Hoeper effectively concedes it. See Brief for Respondent 30 (acknowledging that if the Colorado Supreme Court actually said "'an airline may be denied ATSA immunity . . . for reporting true information,'" then "the court was likely wrong"). Hoeper does point out in a footnote that given Congress' desire to deny immunity to "'bad actors,'" and "given that the vast majority of reckless statements will *not* turn out to be true[,] . . . Congress could have quite reasonably chosen to deny the special privilege of ATSA immunity to all reckless speakers," even those whose statements turned out to be true. *Id.,* at 30, n. 12. But although Congress could have made this choice, nothing about the statute's text or purpose suggests that it actually did. Instead, Congress chose to model the exception to ATSA immunity after a standard we have long construed to require material falsity.

B

We are not persuaded by Hoeper's arguments that we should affirm the judgment of the Colorado Supreme Court notwithstanding its misapprehension of the ATSA immunity standard.

Hoeper first argues that Air Wisconsin forfeited the claim that it is entitled to immunity because its statements were materially true. His premise is that Air Wisconsin argued the truth of its statements only in challenging the evidentiary basis for the defamation verdict, not in asserting immunity. But Air Wisconsin's brief before the Colorado Supreme Court argued that the exception to ATSA immunity "appears to incorporate the *New York Times* actual malice standard," which—as we have ex-

plained—requires material falsity. Petitioner's Opening Brief in No. 09SC1050, p. 24.

Hoeper next argues that the Colorado Supreme Court performed the requisite analysis of material falsity, albeit in the context of finding the record sufficient to support the jury's defamation verdict. For several reasons, however, this analysis does not suffice for us to affirm the denial of ATSA immunity. First, to the extent that the immunity determination belongs to the court—as the Colorado Supreme Court held—a court's deferential review of jury findings cannot substitute for its own analysis of the record. Second, the jury here did not find that any falsity in Air Wisconsin's statements was material, because the trial court instructed it only to determine whether "[o]ne or more of th[e] statements was false," App. 580, without addressing materiality. Third, applying the material falsity standard to a defamation claim is quite different from applying it to ATSA immunity. In both contexts, a materially false statement is one that "'would have a different effect on the mind of the reader [or listener] from that which the . . . truth would have produced.'" *Masson*, 501 U. S., at 517. But the identity of the relevant reader or listener varies according to the context. In determining whether a falsehood is material to a defamation claim, we care whether it affects the subject's reputation in the community. In the context of determining ATSA immunity, by contrast, we care whether a falsehood affects the authorities' perception of and response to a given threat.[3]

—————

[3] These are very different inquiries. Suppose the TSA receives the following tip: "My adulterous husband is carrying a gun onto a flight." Whether the husband is adulterous will presumably have no effect on the TSA's assessment of any security risk that he poses. So if the word "adulterous" is false, the caller may still be entitled to ATSA immunity. But any falsity as to that word obviously would affect the husband's reputation in the community, so it would be material in the context of a defamation claim.

### III

Finally, the Colorado Supreme Court's analysis of material falsity was erroneous. We turn next to explaining why, by applying the ATSA immunity standard to the facts of this case.[4]

### A

We begin by addressing how to determine the materiality of a false statement in the ATSA context. As we noted earlier, a materially false statement is generally one that "'would have a different effect on the mind of the reader [or listener] from that which the . . . truth would have produced.'" *Ibid.* The parties quibble over whether ATSA immunity requires some special version of this standard, but they more or less agree—as do we—that the usual standard suffices as long as the hypothetical reader or listener is a security officer.

A further question is what it means for a statement to produce "'a different effect on the mind of'" a security officer from that which the truth would have produced. In defamation law, the reputational harm caused by a false statement *is* its effect on a reader's or listener's mind. But contrary to the position of Hoeper's counsel at oral argument, Tr. of Oral Arg. 32–33, courts cannot decide whether a false statement produced "'a different effect on the mind of'" a hypothetical TSA officer without considering the effect of that statement on TSA's behavior. After all, the

---

[4] We "recognize the prudence . . . of allowing the lower courts 'to undertake [a fact-intensive inquiry] in the first instance.'" *Holland* v. *Florida*, 560 U. S. 631, 654 (2010). Here, however, we conclude that another prudential consideration—the need for clear guidance on a novel but important question of federal law—weighs in favor of our applying the ATSA immunity standard. Cf. *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 503 (1984) ("[T]his Court's role in marking out the limits of [a First Amendment] standard through the process of case-by-case adjudication is of special importance").

whole reason the TSA considers threat reports is to deter-
mine and execute a response.

A plaintiff seeking to defeat ATSA immunity need not
show "precisely what a particular official or federal agency
would have done in a counterfactual scenario." Brief for
United States as *Amicus Curiae* 27. Such a showing
would be "impossible . . . given the need to maintain se-
crecy regarding airline security operations." Brief for Re-
spondent 42. But any falsehood cannot be material, for
purposes of ATSA immunity, absent a substantial likeli-
hood that a reasonable security officer would consider it
important in determining a response to the supposed
threat. Cf. *TSC Industries, Inc.* v. *Northway, Inc.*, 426
U. S. 438, 449 (1976) (an omission in a proxy solicitation
"is material if there is a substantial likelihood that a
reasonable shareholder would consider it important in
deciding how to vote"). This standard "is an objective
one, involving the [hypothetical] significance of an omitted
or misrepresented fact to a reasonable" security official,
rather than the actual significance of that fact to a partic-
ular security official. *Id.,* at 445.

B

We apply the material falsity standard to the facts of
this case. In doing so, we neither embrace nor reject the
Colorado Supreme Court's unanimous holding "that im-
munity under the ATSA is a question of law to be deter-
mined by the trial court before trial." 2012 WL 9097764,
*4; see *id.,* at *11 (Eid, J., concurring in part and dissent-
ing in part) (agreeing with majority). Rather, we conclude
that even if a jury were to find the historical facts in the
manner most favorable to Hoeper, Air Wisconsin is enti-
tled to ATSA immunity as a matter of law.

We begin with Air Wisconsin's statement that Hoeper
"was an FFDO who may be armed." App. to Pet. for Cert.
111a. Hoeper cannot dispute the literal truth of this

statement: He was an FFDO, and because FFDOs possess weapons, any FFDO "may be armed." Hoeper argues only that to avoid any misinterpretation, Air Wisconsin should have qualified the statement by adding that it had no reason to think he was actually carrying his gun during the trip to Virginia, especially because he was not allowed to do so under §44921(f)(1).[5] We agree that Air Wisconsin's statement could have been misinterpreted by some, but we reject Hoeper's argument for two reasons. First, any confusion of the nature that Hoeper suggests would have been immaterial: A reasonable TSA officer, having been told only that Hoeper was an FFDO and that he was upset about losing his job, would have wanted to investigate whether Hoeper was carrying his gun. Second, to accept Hoeper's demand for such precise wording would vitiate the purpose of ATSA immunity: to encourage air carriers and their employees, often in fast-moving situations and with little time to fine-tune their diction, to provide the TSA immediately with information about potential threats. Baggage handlers, flight attendants, gate agents, and other airline employees who report suspicious behavior to the TSA should not face financial ruin if, in the heat of a potential threat, they fail to choose their words with exacting care.[6]

——————

[5] See Tr. of Oral Arg. 42–43 (concession by Hoeper's counsel that "it would have been true for [Air Wisconsin] to say, look, we're calling to let you know, because Mr. Hoeper's an FFDO, we don't have any reason to believe that he has gun with him, but we can't tell for sure, so we just thought we would tell you, in case you have any questions and want to investigate further").

While we take the jury's findings at face value, we note that the record suggests Air Wisconsin may well have added the qualifier that Hoeper argues was necessary. An internal TSA e-mail summarizing Doyle's call concludes by stating: "[Redacted] does not believe [redacted] is in possession of a firearm at this time." App. 414.

[6] Hoeper also takes issue with Air Wisconsin's statement that it was "concerned about . . . the whereabouts of his firearm," App. to Pet. for

We next consider Air Wisconsin's statement that Hoeper "was terminated today." App. to Pet. for Cert. 111a. When Air Wisconsin made that statement, Hoeper had not yet been fired. But everyone knew the firing was almost certainly imminent. Hoeper acknowledged that his employment was "at [Air Wisconsin's] discretion" after his third failed test, App. 193, and the agreement between him and Air Wisconsin stated that his "fourth . . . attempt" to pass the test would be his "final" one, *id.,* at 426. No reasonable TSA officer would care whether an angry, potentially armed airline employee had just been fired or merely knew he was about to meet that fate.

Finally, we consider Air Wisconsin's statements that Hoeper was "[u]nstable" and that it was "concerned about his mental stability." App. to Pet. for Cert. 111a. Although the details of Hoeper's behavior during the simulator session may be disputed, Hoeper himself testified that he had become visibly angry: He decided "that's it," he removed his headset and "toss[ed] it," and he accused the instructor—at an "elevated decibel level," and with an expletive—of "railroading the situation." App. 203–204. It would surely have been correct, then, for Air Wisconsin to report that Hoeper "'blew up'" during the test. 2012 WL 907764, *8. The question is whether, from the perspective of a reasonable security officer, there is any material difference between a statement that Hoeper had just "blown up" in a professional setting and a statement that he was "[u]nstable." We think not.

We are no more troubled by Air Wisconsin's related statement that it was "concerned about [Hoeper's] mental stability." Hoeper is correct that many of the Air Wisconsin officials who attended the meeting at headquarters

———————

Cert. 111a. But his arguments concerning this statement are the same as those concerning the statement that he "may [have] been armed," *ibid.*, and we reject them for the same reasons.

might not have framed their concerns in terms of "mental stability." LaWare, for instance, testified that "[t]hose weren't the words that [he] would have anticipated" when he directed Doyle to call the TSA. App. 272. But the officials who attended the meeting did harbor concerns about Hoeper's mental state: They knew he had just "blown up," and they worried about what he might do next. It would be inconsistent with the ATSA's text and purpose to expose Air Wisconsin to liability because its employee could have chosen a slightly better phrase than "mental stability" to articulate its concern. Just as "[m]inor inaccuracies do not amount to falsity" in the defamation context, "so long as 'the substance, the gist, the sting, of the libelous charge be justified,'" *Masson,* 501 U. S., at 517, a statement that would otherwise qualify for ATSA immunity cannot lose that immunity because of some minor imprecision, so long as "the gist" of the statement is accurate. Doyle's statements to the TSA accurately conveyed "the gist" of the situation; it is irrelevant whether trained lawyers or judges might with the luxury of time have chosen more precise words.

Hoeper's overarching factual theory appears to be that members of the BAe-146 team, including Doyle and Schuerman, harbored personal animosity toward him, which caused them to manipulate the proficiency tests in order to fail him. But even if Hoeper were correct about all this (and we express no view on that question), we do not see why it would have made him any less a threat in the eyes of a reasonable security officer. As between two employees—one who thinks he is being fired because of his inadequate skills, another who thinks he is being fired because his employer hates him—the latter is presumably more, not less, likely to lash out in anger.

The partial dissent argues that Doyle's reference to Hoeper's "mental stability" was so egregious as to make his report to the TSA the basis of a $1.2 million defama-

tion judgment. We disagree. While lawyers and judges may in some contexts apply the label "mentally unstable" to people suffering from serious mental illnesses, see *post,* at 4 (SCALIA, J., concurring in part and dissenting in part), that is hardly the only manner in which the label is used. A holding that Air Wisconsin lost its ATSA immunity by virtue of Doyle's failure to be aware of every connotation of the phrase "mental stability" would eviscerate the immunity provision. All of us from time to time use words that, on reflection, we might modify. If such slips of the tongue could give rise to major financial liability, no airline would contact the TSA (or permit its employees to do so) without running by its lawyers the text of its proposed disclosure— exactly the kind of hesitation that Congress aimed to avoid.

The partial dissent further argues that Hoeper's "display of anger" made him no more a threat than "millions of perfectly harmless air travelers." *Post,* at 4. But Hoeper did not just lose his temper; he lost it in circumstances that he knew would lead to his firing, which he regarded as the culmination of a vendetta against him. And he was not just any passenger; he was an FFDO, which meant that he could plausibly have been carrying a firearm. In short, Hoeper was not some traveling businessman who yelled at a barista in a fit of pique over a badly brewed cup of coffee.

Finally, the partial dissent relies on an expert's testimony "that Hoeper's behavior did not warrant *any* report to the TSA." *Post*, at 4 (citing App. 356). But the expert appears to have based that statement on an outdated understanding of reporting obligations that is flatly at odds with the ATSA. Prior to the ATSA, "airlines were responsible for assessing and investigating possible threats to airline security." 2012 WL 907764, *14 (Eid, J., concurring in part and dissenting in part). But the ATSA shifted that responsibility to the TSA, creating a policy

"known as 'when in doubt, report.'" *Ibid.*; see *supra*, at 9. The expert who believed that Hoeper's conduct did not warrant a report to the TSA also believed that airlines have "an obligation . . . to filter out . . . the low noise from . . . what's significant" in reporting threats. App. 356. That understanding does not comport with the policy that Congress chose to enact.

The Colorado Supreme Court recognized that even if the facts are viewed in the light most favorable to Hoeper, Air Wisconsin "would likely be immune" had it "reported that Hoeper . . . knew he would be terminated soon, that he had acted irrationally at the training three hours earlier and 'blew up' at test administrators, and that he was an FFDO pilot." 2012 WL 907764, *8. But the court erred in parsing so finely the distinctions between these hypothetical statements and the ones that Air Wisconsin actually made. The minor differences are, for the reasons we have explained, immaterial as a matter of law in determining Air Wisconsin's ATSA immunity.

By incorporating the actual malice standard into §44941(b), Congress meant to give air carriers the "'breathing space'" to report potential threats to security officials without fear of civil liability for a few inaptly chosen words. *New York Times*, 376 U. S., at 272. To hold Air Wisconsin liable for minor misstatements or loose wording would undermine that purpose and disregard the statutory text.

\* \* \*

The judgment of the Supreme Court of Colorado is therefore reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

No. 12–315

————

## AIR WISCONSIN AIRLINES CORPORATION, PETITIONER *v.* WILLIAM L. HOEPER

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
COLORADO

[January 27, 2014]

JUSTICE SCALIA, with whom JUSTICE THOMAS and JUSTICE KAGAN join, concurring in part and dissenting in part.

I agree with the Court that under the Aviation and Transportation Security Act (ATSA), 49 U. S. C. §44901 *et seq.*, an airline may not be denied immunity for a report it made to the Transportation Security Administration (TSA) absent a finding that the report was materially false. I also agree that, in this context, materiality means that the falsehood had a natural tendency to influence a reasonable TSA officer's determination of an appropriate response to the report; and that neither the jury nor the courts below considered material falsity in this ATSA-specific way. I therefore join Parts I, II, and III–A of the Court's opinion.

Having answered the question we granted certiorari to decide, see 570 U. S. ___ (2013), I would stop there and remand the case for further proceedings. Instead, the Court proceeds to "apply the [ATSA] material falsity standard to the facts of this case" in the first instance, *ante,* at 13, and concludes as a matter of law that Air Wisconsin's report to the TSA about William Hoeper was not materially false. In so holding, the Court in my view reaches out to decide a factbound question better left to the lower courts, and then proceeds to give the wrong

answer. I therefore respectfully dissent from Part III–B and the disposition.

We have held that under the First Amendment, a court's role is to determine whether "[a] reasonable jury could find a material difference between" the defendant's statement and the truth. *Masson* v. *New Yorker Magazine, Inc.*, 501 U. S. 496, 522 (1991). That makes sense, since materiality is the sort of "'mixed question of law and fact'" that "has typically been resolved by juries." *United States* v. *Gaudin*, 515 U. S. 506, 512 (1995). The jury has a vital role to play in the materiality inquiry, which entails "'delicate assessments of the inferences a "reasonable decisionmaker" would draw from a given set of facts and the significance of those inferences to him'" and is therefore "'peculiarly one for the trier of fact.'" *Ibid.* (quoting *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U. S. 438, 450 (1976); brackets omitted). Such a question cannot be withdrawn from the jury unless "the facts and the law will reasonably support only one conclusion" on which "reasonable persons . . . could [not] differ." *McDermott Int'l, Inc.* v. *Wilander*, 498 U. S. 337, 356 (1991). The same rule applies to a determination of immunity from suit: When a defendant raises qualified immunity on summary judgment, the court must "adop[t] . . . the plaintiff's version of the facts" unless "no reasonable jury could believe it." *Scott* v. *Harris*, 550 U. S. 372, 378–380 (2007).

Therefore, if we are to apply the ATSA materiality standard to the complex record in this case in the first instance, it is proper to view "the historical facts in the manner most favorable to Hoeper," as the Court purports to do. *Ante,* at 13. We must of course begin by taking as given the findings that we *know* the jury already made, including that Air Wisconsin told the TSA that the airline was "concerned about [Hoeper's] mental stability" and that he was an "[u]nstable pilot," App. to Pet. for Cert. 111a (special verdict form), and that those statements were

false, 2012 WL 907764, \*10 (Colo., Mar. 19, 2012). Next, we must ask whether a reasonable jury *could* find the remaining historical facts to be such that those statements were not only false, but *materially* false from the perspective of a reasonable TSA agent. If not, judgment for Air Wisconsin is proper; but if so, the ATSA materiality question should be tried to a (properly instructed) jury. (Unless, of course, a reasonable jury would be *compelled* to find facts that would render the statements materially false, in which case judgment for Hoeper would be proper; but that is assuredly not the case here.)

Applying that reasonable-jury standard, I do not see how we can possibly hold as a matter of law that Air Wisconsin's report was not materially false. The Court acknowledges Hoeper's description of the confrontation that spawned the airline's threat report: After failing a flight simulator test, Hoeper "decided 'that's it,' he removed his headset and 'toss[ed] it,' and he accused the instructor—at an 'elevated decibel level,' and with an expletive—of 'railroading the situation.'" *Ante,* at 15 (quoting App. 203–204). A jury could credit Hoeper's account. It could also believe his "overarching factual theory" that his anger was reasonable because the instructor had "manipulate[d]" the test to cause him to fail out of "personal animosity," *ante,* at 16—a theory that was not without supporting evidence, see, *e.g.,* App. 259–260 (pilot testifying as expert witness that Hoeper's testing was "absolutely unfair" and "biased"). Moreover, there was evidence from which a jury could conclude that no one who interacted with Hoeper during or after the confrontation— including the instructor—viewed him as either unstable or threatening. See, *e.g., id.,* at 15–16 (instructor acknowledging that he "'quickly realized it wasn't a threatening situation'"); *id.,* at 29–31 (instructor testifying he "'never felt that [Hoeper] was going to go do something stupid,'" "'didn't believe that Mr. Hoeper posed a threat in any way

to anybody else at all,'" "'did not believe that Mr. Hoeper was engaging in irrational behavior,'" and "'deem[ed] him perfectly safe to get on an airplane'"); *id.*, at 462 (airline representative who gave Hoeper permission to fly home testifying he "had no concern that [Hoeper] was a physical threat to anybody" and "didn't believe he was mentally unstable").

In short, a jury *could* find that Hoeper did nothing more than engage in a brief, run-of-the-mill, and arguably justified display of anger that included raising his voice and swearing, but that did not cause anyone, including the person on the receiving end of the outburst, to view him as either irrational or a potential source of violence. Viewing the facts in that light, I cannot agree with the Court that a reasonable TSA official would not "consider . . . important," *ante,* at 13, the difference between an individual who engaged in this sort of heated but commonplace display of anger, on the one hand, and on the other, an individual whose colleagues regard him as "mentally unstable." It is the difference between a category that no doubt includes millions of perfectly harmless air travelers and one that, in ordinary parlance, connotes an alarming degree of unpredictability and aggressiveness. Indeed, we have used that term in connection with individuals so "dangerously mentally ill" that they may be subject to civil confinement. *Kansas* v. *Hendricks*, 521 U. S. 346, 363 (1997). The importance of that difference was highlighted by the expert testimony in this case of a former TSA Federal Security Director, who stated—based on a version of the underlying facts the jury was entitled to accept—that Hoeper's behavior did not warrant *any* report to the TSA. App. 356.*

----

*The Court dismisses the former Director's testimony because he testified that in making threat reports to the TSA, airline officials should use "common sense" to "filter out the garbage and report [only]

The association with dangerous mental illness is not, as the Court suggests, merely one "connotation of the phrase 'mental [in]stability'" among many, *ante,* at 17; it is the everyday understanding of that phrase. The Court says that this is "hardly the only manner in which the label is used," *ibid.*, but it does not even attempt to describe another usage, let alone one that would be a materially accurate description of the facts of this case as a jury might find them. The Court also suggests that the circumstances of this case—particularly the fact that Hoeper knew his firing was imminent, had reason to be angry with the airline, and was authorized to carry a firearm—distinguish Hoeper's confrontation with the instructor from an ordinary "fit of pique." *Ibid.* But if so, it was *all the more important* for the airline to make an accurate report to the TSA, so that the agency could assess the possible danger and determine an appropriate response. Falsely reporting to the TSA that a young Irishman is an IRA terrorist is much more likely to produce a prompt and erroneous response than reporting that a 70-year-old English grandmother is. The circumstances the Court identifies enhanced, rather than diminished, the likelihood that the false "mentally unstable" designation would have a material effect on the TSA's response.

In sum, it is simply implausible that, taking the facts of

———————

really suspicious incidents," App. 356, a view the Court deems "flatly at odds with the ATSA," *ante,* at 17. The ATSA, however, simply requires airlines to report "threat[s] to civil aviation," 49 U. S. C. §44905(a). The statute surely places a heavy thumb on the scale in favor of reporting, but it certainly does not preclude the exercise of reasonable judgment in deciding what rises to the level of a "threat" and what constitutes, as the former Director put it, irrelevant "garbage." And even if one disagrees with the former Director that no report should have been made at all, the point is that a reasonable jury could have considered his testimony relevant to establishing that falsely expressing concerns about an individual's "mental stability" in the circumstances of this case would have a material effect on the TSA's decisionmaking process.

this case in the light most favorable to Hoeper, a reasonable jury would *have* to find that the report of mental instability would have no effect upon the course of action determined by the TSA. The Court's holding to the contrary demonstrates the wisdom of preserving the jury's role in this inquiry, designed to inject a practical sense that judges sometimes lack. I respectfully dissent from that holding.