Filed 6/8/22 ; Certified for Publication 6/29/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KELLY ILCZYSZYN et al.,<br><br>        Plaintiffs and Appellants,<br>v.<br>SOUTHWEST AIRLINES CO.,<br><br>        Defendant and Appellant. | A158352<br><br>(Alameda County<br>Super. Ct. No. RG15766954) |

Southwest Airlines passenger Richard Ilczyszyn tragically suffered a massive pulmonary embolism[1] while locked inside an airplane lavatory during the final stages of a flight from Oakland to Orange County.  Rather than treating Ilczyszyn's circumstances as a medical emergency, the flight crew perceived him to be a security threat.  As a result, he did not receive medical care until after the flight had landed and the other passengers had disembarked.  By then, he had gone into cardiac arrest.  Although he was resuscitated, he later died in a hospital.  Ilczyszyn's widow Kelly, together with his three children, sued defendant Southwest Airlines Co. (Southwest) alleging that the flight crew's failure to provide medical assistance caused his

---

[1] A pulmonary embolism occurs when an internal blood clot breaks off and travels via the veins through the heart, lodging in a pulmonary artery and blocking blood flow to the lungs.

death. Following a lengthy trial, the jury found that Southwest was negligent but found against plaintiffs on the issue of causation.

On appeal, plaintiffs assert that the trial court erred in ruling at the outset of trial that Southwest was immune from liability under both title 49 United States Code section 44941 (section 44941)[2] of the Aviation and Transportation Security Act, and Civil Code section 47, subdivision (b) for any act or omission occurring after the flight crew decided to treat Ilczyszyn's medical emergency as a security threat. Plaintiffs contend these statutory immunities apply only to the actual disclosure of a security threat, and not to conduct associated with such disclosures. They also maintain that the immunity is inapplicable here because the gravamen of their case was based solely on the flight crew's negligent failure to identify the medical emergency and provide aid. They argue that the court's alleged error limited both the admissibility of their evidence and the scope of their arguments, making it impossible for them to prove the element of causation.

We conclude that the trial court properly applied section 44941 immunity. Accordingly, we affirm.

---

[2] In relevant part, 49 United States Code section 44941(a) (section 44941(a)) provides: "Any air carrier . . . or any employee of an air carrier . . . who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism . . . to any . . . Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, for such disclosure."

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Flight 4640*

On September 19, 2014, Ilczyszyn was traveling by air from Chicago to his home in Orange County. After arriving at the Oakland International Airport, he boarded Southwest flight No. 4640 (Flight 4640), a connecting flight from Oakland to John Wayne Airport. The one-hour flight took off at around 9:15 p.m. At some point during the flight, Ilczyszyn left his seat and went to a lavatory in the back of the plane. While inside the lavatory, he suffered a massive pulmonary embolism.

The flight attendants became aware that Ilczyszyn was in the lavatory and attempted to communicate with him through the closed door. Although he was making crying sounds, he was unresponsive. After the flight attendants tried unsuccessfully to access the lavatory by pushing on the folding door, the airplane's captain assessed the situation as a security threat and initiated security protocols. He contacted Southwest ground operations and requested that law enforcement officers meet the plane at the arrival gate.

After the airplane landed, Orange County Sheriff's Department deputies spoke with the flight attendants and decided to deplane the passengers before accessing the lavatory. By then, Ilczyszyn had gone into cardiac arrest. When the deputies forced the lavatory door open, they found him unconscious with no pulse. After receiving cardiopulmonary resuscitation (CPR), he recovered a stable heart rhythm. By this time, he had already suffered severe brain damage due to lack of oxygen. He died in a hospital the following day. An autopsy report listed the cause of death as pulmonary thromboembolism due to deep venous thrombosis.

3

## B.    Plaintiffs' Legal Action

### 1.    Complaint and Summary Judgment Motions

On April 20, 2015, plaintiffs filed a wrongful death action against Southwest and the flight crew on Flight 4640, including pilots Captain Joseph Walker and First Officer Christopher Krawec, and Flight Attendants Cynthia L. Jenkins, Christina Green, Jenna A. King, and Kristina Lynn Klotz.  Plaintiffs alleged the flight crew was aware that Ilczyszyn was experiencing a medical emergency but decided to treat him as a disruptive passenger, leaving him unattended and delaying medical treatment by falsely reporting to law enforcement personnel that he had barricaded himself in the lavatory.

In December 2017, Southwest filed motions for summary judgment, asserting that it and the individual employee defendants were entitled to the federal immunity for reporting suspicious behavior under section 44941. Southwest also argued that plaintiffs' claims were barred by Civil Code section 47, subdivision (b), which provides immunity for reports of suspected criminal activity made to law enforcement.  Southwest further asserted that its employees' conduct did not cause Ilczyszyn's death.

In June 2018, the trial court granted summary judgment in favor of Walker and Krawec after determining that the pilots' security-related reports were subject to section 44941 immunity and were also privileged under Civil Code section 47, subdivision (b).  However, the court denied summary judgment as to the flight attendants and Southwest.[3]  Among other things, the court found that "Southwest has not established as a matter of law that all of its alleged liability derive[d] from the 'disclosure' to law enforcement of

---

[3] The individual defendants were dismissed from the lawsuit prior to trial.

4

a suspected security threat." The court also found that there were triable issues as to causation, based on the likely testimony from competing medical expert witnesses.

### 2.    Motion in Limine No. 4

Before trial, Southwest filed motion in limine No. 4. Southwest invoked section 44941's immunity in arguing that the exclusion of certain evidence was "necessary to avoid a jury potentially imposing liability based on allegedly inaccurate or incomplete language used by an airline employee when reporting, to law enforcement, what he or she understood, believed or feared about a passenger's suspicious behavior." Specifically, Southwest sought to preclude plaintiffs from offering any evidence or argument arising from (1) Captain Walker's security-related communications with Southwest ground personnel; (2) reports that Southwest ground personnel made to law enforcement officers; and (3) the conduct that followed these reports, including the officers' decision to deplane the passengers before accessing the lavatory. Southwest also urged that plaintiffs should be barred from asserting that its employees had a duty to further assess or investigate Ilczyszyn's situation once they became suspicious that he posed a security threat. Alternatively, Southwest contended that this evidence should be excluded under Civil Code section 47, subdivision (b).

In opposition, plaintiffs argued that section 44941 applies to "disclosures" only, and not to actions taken as a result of such disclosures. They also asserted that Civil Code section 47 does not bar recovery for personal injuries arising from tortious conduct. They stressed that their case was not based on any disclosure or statement. Instead, their claim was that had the flight attendants made a proper assessment of Ilczyszyn's condition a security threat never would have been declared and the plane would have

5

been met at the arrival gate by paramedics, not law enforcement. Following several hearings and two rounds of supplemental briefing, the court granted the motion in part.

First, the trial court divided the facts of the case into four temporal phases. Phase 1 consisted of the period of time during which the flight attendants discovered Ilczyszyn in the bathroom and tried to assess his situation. Phase 2 consisted of the period between when Captain Walker first spoke to the flight attendants and when he declared a security threat. Phase 3 consisted of the period during which the plane was in "lockdown." The final phase, Phase 4, consisted of the period after the plane landed and law enforcement took control of the situation.

The trial court determined that Southwest was immune from liability for conduct occurring after Phase 1, that is, "after the flight attendants made their initial report to the captain of the potential security threat posed by Mr. Ilczyszyn which formed the basis for the captain's subsequent orders [to initiate security protocols]." The court concluded that evidence of such conduct would be inadmissible as it was "irrelevant to the jury's consideration." As to Phase 1 itself, the court ruled that plaintiffs would be "entitled to present . . . their version of the evidence related to the initial assessment [of Ilczyszyn] and make any reasonable arguments that flow from any misassessment . . . during that very first interval of time."

## C. *The Jury Trial*

In their opening argument, plaintiffs' counsel contended that the Southwest flight crew negligently assumed Ilczyszyn was a security threat rather than a person suffering a medical emergency, asserting that the crew's failure to provide him with basic aid and oxygen after he fell ill was a

6

substantial factor in causing his death.  Below, we summarize the extensive evidence introduced at trial.

### 1.    The Flight

On the evening of Ilczyszyn's flight, Jenkins was assigned to the front of the cabin as the lead flight attendant.  As the lead flight attendant, she communicated with the other flight attendants and the pilots via the airplane's cabin service interphone.  Green and King were assigned to the back of the cabin, while Klotz was assigned to work the front of the cabin during takeoff and landing, and the back of the cabin during the flight.  Ilczyszyn was seated in a window seat next to a couple who were both licensed physicians.

At some point before the flight's final descent, Ilczyszyn left his seat and went to a lavatory in the back of the plane.  While inside the lavatory, he suffered a massive pulmonary embolism.  Passengers who were seated in the back of the plane testified that they heard unusual noises coming from the lavatory.  One witness described the noises as an eerie sound that she had never heard before.  Another said he heard loud noises, almost like grunting or growling.  The sounds would get louder and then stop, and then go from softer to louder again.  The volume and frequency of the sounds decreased as the airplane got closer to landing.

As the flight attendants were cleaning the cabin in preparation for final descent, they heard what sounded like a child crying.  Green went to the back row where a family of four was sitting and asked the father if everything was okay.  He told her that the crying was coming from the lavatory.   Klotz walked up the aisle to try and locate the parents of the crying child.  When she realized that someone, possibly the child, was still in the lavatory, she began asking passengers who was with the small child in the bathroom.  A

7

woman told her that the person in the lavatory was not a child; it was a man who had been in there for a while.

The flight attendants went to the lavatory and knocked on the door but there was no response. They knocked again and asked, "Do you need help?" and "Are you okay? Can you open the door?" Initially, King and Green realized that the person inside could possibly have been experiencing a medical issue. Green was concerned because everyone on board needed to be seated with their seat belts on in preparation for landing.

About five minutes before the "ding" or chime signaled the airplane's final descent, Klotz called Jenkins on the interphone and told her that a male passenger was crying in the rear lavatory and would not come out or acknowledge the crew. Jenkins told Klotz to get the man out of the lavatory. She instructed the flight attendants to pound loudly on the door several times and, if he did not acknowledge them, to let him know that they were going to open the door.

Klotz returned to the lavatory and told King and Green that they needed to unlock the door and get the man out. At that time she believed the only way to access the lavatory was by unlocking the folding door and pushing it in. The flight attendants knocked and asked the man if he could unlock the door, and then told him they were going to unlock it for him and come inside. He did not respond.

A viewing hole can be accessed by sliding the latch on the lavatory door. King slid the latch, and she and Green looked inside. They saw a fully clothed man sitting on the toilet facing the mirror. His body was turned with his head down and his arms resting on the sink. He was crying. He did not move and did not make any threatening gestures. He was not saying anything and did not respond to their questions. For a person of Ilczyszyn's

8

size,[4] one would be able to view his head and torso through the opening. His feet would not be visible due to the limited viewing angle.

The space inside the lavatory is very small. The measurement from the lavatory door to the front of the toilet is one foot 7.5 inches, and from the wall to the sink is one foot nine inches. The door is a bifold door, six feet three inches tall, that slides from right to left. The two sides fold together towards the inside as the door is slid to the left. The door is affixed with two pins or hinges located on the top and bottom of the left side. A roller is attached at the top at the center of the door. To open the door from the outside, you push on the middle of the door. If a man of Ilczyszyn's size was sitting with his head on the sink, his feet would be positioned so as to block the door as it was being pushed in.

Green and King tried to push the door open. As they pushed on the door, Klotz pulled at its lower edge. They could not get the door open because Ilczyszyn's foot and leg were pressed up against it. His foot was pressed so hard against the door that his shoe created an opening at the door's bottom corner.[5] There was conflicting testimony as to whether Ilczyszyn kicked the door as the attendants were trying to pry it open.[6]

---

[4] Ilczyszyn was six feet one inch in height and weighed 229 pounds.

[5] An expert witness for Southwest, estimated that it would take approximately 20 to 40 pounds of force to partially push open the door so that a foot could be visible from the outside.

[6] It was revealed during trial that the lavatory door can easily be detached by removing two release pins. In June 2014, Southwest distributed a safety update notifying flight attendants that the lavatory door could be removed at the hinges by pulling out the pins at the top and bottom of the door and popping it off. Jenkins was not aware of the update at the time of the flight. King had not been trained on how to remove the door, but a flight attendant on a prior flight had shown her how to do it. During the incident,

At this point, King came to believe that the man was intentionally blocking the door. Green was concerned because his behavior was not normal and appeared suspicious. Two or three minutes after Klotz completed her first call to Jenkins, she called Jenkins a second time. Klotz reported that they had tried to open the door but it was being held closed by the passenger.

The pilots can monitor calls being made on the interphone. First Officer Krawec was monitoring the interphone when he overheard Klotz and Jenkins discussing a passenger in the rear lavatory who was refusing to come out. He alerted Captain Walker because the airplane was in final descent. Walker came on the line and spoke with Klotz and Jenkins. He told them to leave the passenger in the lavatory. He then called for law enforcement to meet the airplane at the arrival gate and declared a "lockdown." At trial, Walker testified that the steps he and the crew took after his conversation with Klotz were consistent with how flight crews are trained to address potential security threats.[7]

After the airplane reached the arrival gate, Orange County Sheriff's deputies entered the aircraft and spoke to the flight attendants. The lead

_____

she did not suggest removing the door because the airplane was descending and there would be nowhere to secure the door for landing. It also would have blocked an emergency exit.

[7] Extensive evidence was presented during the trial regarding current training protocols for airline security. Much of this evidence was accorded sensitive security status and was placed under seal and treated as confidential. Because of security concerns, the federal government has not made public the details of "airport security programs." (See 49 U.S.C. § 114(s); 49 C.F.R. § 1520.5.) The confidential evidence offered at trial was relevant to Southwest's argument that its employees were not negligent because they had responded appropriately to a perceived security threat. Because the jury found in favor of plaintiffs on the element of negligence, we will not refer to any of the confidential evidence in this opinion.

deputy ordered all the passengers to exit the plane before he and other deputies accessed the lavatory. When the deputies finally contacted Ilczyszyn, he was in cardiac arrest.[8] CPR was administered and emergency medical responders were summoned.

Ilczyszyn was asystole, which means there was no electrical or mechanical activity in his heart. After receiving medical interventions, a relatively stable heart rhythm was restored and his heart began pumping on its own. He was transported to a hospital where died the next day following severe brain swelling due to prolonged lack of oxygen.

### 2.    Medical Support and Flight Attendant Training

The jury was told that the airplane on Flight 4640 was furnished with emergency medical equipment, including portable oxygen bottles and a defibrillator. Flight attendants are trained to recognize and treat medical emergencies, and to administer CPR and oxygen. They are authorized to page the cabin and ask for any medical providers on the airplane to provide assistance. They can also consult with on-call physicians on the ground. The captain can call for paramedics to meet an ill passenger at the arrival gate.

It is undisputed that while Jenkins knew that unresponsiveness and crying could be symptoms of a serious medical condition, she did not tell the other flight attendants to assess Ilczyszyn's health. Further, although other flight attendants testified that they initially thought he might have been experiencing a medical emergency, they did not page the cabin for a health care provider. Nor did they seek the advice of a ground-based medical consultant. The flight was not a full flight, and the attendants could have

---

[8] The jury was told that Ilczyszyn went into cardiac arrest as the airplane was touching down.

laid Ilczyszyn in a row of seats and given him oxygen had they removed him from the lavatory.

Kathleen Lord-Jones testified for plaintiffs as an expert on the standard of care for flight attendants. She explained that flight attendants are trained to assess and treat medical symptoms using the equipment that is available inside the aircraft. She opined that the flight attendants on Flight 4640 breached the standard of care by failing to assess the situation as a medical event. She noted that Ilczyszyn was positioned with his head down on his arm, was not moving, was continually crying, and was unresponsive to their questions. These are all indications of a serious medical situation. Per their training, the flight attendants should have assessed him to see if he was having a stroke. They also breached the standard of care by failing to provide him with oxygen, failing to communicate effectively with each other, and failing to read the training manual update on how to remove the lavatory door.

### 3. Medical Evidence

#### a. *Plaintiffs' Expert Witnesses*

Dr. Michael Fishbein testified as an expert in pathology. He stated that Ilczyszyn had died of a pulmonary embolism. A pulmonary embolism occurs when a blood clot forms inside the body and breaks off, traveling through the veins to the right side of the heart and into the main blood vessels that go to the lungs, which are the pulmonary arteries.[9] An embolism

---

[9] In its appellate brief, Southwest *twice* inserts a disturbingly graphic photograph of a massive blood clot that was shown to the jury but was not made an exhibit. Southwest's counsel are experienced litigators and know better than to proceed in this manner. California Rules of Court, rule 8.204(d) permits a party to attach to a brief "copies of exhibits or other materials in the appellate record." Because the photograph was not a trial

can travel to the lungs quickly, within seconds to minutes. Dr. Fishbein opined that Ilczyszyn's blood clot might have been related to Achilles tendon surgery that he underwent in July 2014, about two and a half months before suffering the embolism.

Ilczyszyn's autopsy showed that both his left and right pulmonary arteries were partially blocked by blood clots. The clots were up to 1.5 centimeters in diameter, a little more than half an inch. The clots found during the autopsy would have been the same size as when Ilczyszyn was on the airplane, because clots do not change in size if a patient dies within one day. Dr. Fishbein estimated that Ilczyszyn's pulmonary arteries would have been at least 2.0 centimeters and up to 2.4 centimeters in diameter. Therefore, his arteries were about two-thirds (or 66 percent) to 75 percent blocked. This blockage would have caused a decrease in the oxygen available to his organs and would have forced his heart to work harder, creating the potential for cardiac arrythmia.

During cross-examination, Dr. Fishbein agreed with Southwest's counsel that extensive CPR like that which Ilczyszyn received can cause clots to break up and move around. He noted that while Ilczyszyn's blood oxygen level was dangerously low when measured by first responders, it climbed to a normal level after he was resuscitated. Usually death from pulmonary embolism arises from a combination of factors. Stress on the heart muscle

---

exhibit, it is not part of the appellate record. We therefore decline to consider it. (See *Duggan v. Moss* (1979) 98 Cal.App.3d 735, 739 [disregarding affidavits included in opening brief that were not part of the appellate record]; *People v. Hickok* (1964) 230 Cal.App.2d 57, 60 ["Appellant's affidavit, attached to his opening brief, forms no part of the record on appeal, and may not be considered by us in our disposition of the issue raised here."]; *Ivens v. Simon* (1963) 212 Cal.App.2d 177, 182–183 [disregarding exhibits attached to a brief that were not part of the appellate record].)

caused by pressure from the clot can cause heart failure. Regarding oxygen, Dr. Fishbein agreed with Southwest's counsel that the problem is not that oxygen is not getting into the lungs. The problem is that oxygenated blood is not getting out of the lungs.

Dr. Jeffrey Goodman testified as an expert in the care and treatment of irregular heart rhythms. He explained that pulmonary embolisms affect the body by decreasing the amount of oxygenated blood that is delivered to vital organs like the brain and the heart. An established way to raise oxygen levels and prevent heart failure is to give the patient supplemental oxygen. A patient can be given 100 percent oxygen, which will increase the amount of oxygen that is delivered to vital organs. This occurs because when a pulmonary embolism is not completely blocking the heart's vessels, some blood is still circulating, and supplemental oxygen will increase the amount of oxygen available to the blood that does get through.

Dr. Goodman opined that Ilczyszyn would have survived if 100 percent oxygen had been administered to him on the airplane before the security threat was declared. There was a reasonable degree of medical probability that Ilczyszyn would not have gone into cardiac arrest because the intervention would have supplied more oxygen to his vital organs. When he was first discovered in the lavatory, he was still alive and had not incurred significant, irreversible brain damage because he was still oxygenating. His heart had not yet arrested because he was still making noises. Even after suffering cardiac arrest, he was later resuscitated and therefore could have been resuscitated at an earlier point.

### b.     Southwest's Expert Witnesses

Dr. Timothy Albertson testified for Southwest as an expert in pulmonology. He reiterated that Ilczyszyn's cause of death was a massive

14

pulmonary embolism. A "massive" pulmonary embolism is one so large and so strategically placed that it results in significant changes in a patient's physiology, often resulting in cardiac arrest. He opined that the pulmonary embolism Ilczyszyn suffered was not survivable, as such embolisms have a 65 to 95 percent mortality rate. Even if he had been given 100 percent oxygen on the airplane, Ilczyszyn would not have lived.

Dr. Albertson noted that because the oxygen bottles on an aircraft are small, it is not possible to give a patient 100 percent oxygen. Only about 25 percent oxygen can be administered. A hospital ventilator can provide a patient with 100 liters of oxygen per minute, which is about 20 to 25 times more oxygen than a portable oxygen bottle can provide. But regardless of the percentage of oxygen being delivered, it is impossible to oxygenate blood that does not pass through the right side of the heart and into the lungs. Dr. Albertson agreed with Dr. Fishbein that the problem with a pulmonary embolism is not that oxygen is not getting into the lungs; the problem is that oxygenated blood is not getting out of the lungs.

Dr. Albertson stated that Ilczyszyn's pulmonary embolism would not have impeded his ability to inhale oxygen up until the point where he went into cardiac arrest. However, giving additional oxygen would not have helped because his primary problem was a blockage in blood flow. If blood is not going through the circulatory system, then oxygen cannot be delivered to the body's tissues. Because there was a partial blockage only, it is likely that some blood was still getting through. However, there was not enough blood flow to prevent his death. The only reasonable treatment available on the airplane would have been supplemental oxygen, but this would have been ineffective because of his low blood flow rate.

15

Apart from causing a deficit of oxygenated blood, a pulmonary embolism can lead to cardiac arrest because the right ventricle is forced to pump harder than normal against the blockage. Giving more oxygen does not solve this pumping problem. In Dr. Albertson's opinion, it was inevitable that Ilczyszyn would suffer cardiac arrest on the airplane. Even in a hospital setting, it is possible that such a patient will not be treated in time before they suffer cardiac arrest.

Dr. Albertson told the jury that a return of spontaneous circulation does not mean the patient will survive. Many of the patient's organs may already be damaged, and a return of circulation does not alter the statistical likelihood that 65 to 95 percent of people who suffer a massive pulmonary embolism are going to die. He explained that Ilczyszyn's circulation probably returned because the blood clot was gelatinous, not solid, and the CPR efforts helped displace the clot to allow more blood to flow. By then, his brain had sustained damage from low blood flow and he had no brain activity when he was admitted to the hospital.[10]

Dr. Albertson agreed with plaintiffs' counsel that if Ilczyszyn had made it to the emergency room before his cardiac arrest, or had not suffered cardiac arrest at all, it is more likely than not that he would have survived. But on a scale of 1 to 10 in terms of likelihood of causing cardiac arrest, Ilczyszyn's pulmonary embolism was a 10. Dr. Albertson opined that none of the medical interventions available on the airplane would have stopped Ilczyszyn's pulmonary embolism from progressing to cardiac arrest. And while 97 to 98

---

[10] Dr. Albertson noted that by the time the first responders initiated CPR, Ilczyszyn was in full cardiac arrest. Before he arrived at the hospital, he had a Glasgow Coma Score of 3, which is the lowest number on the scale. This score is consistent with severe neurological impairment, suggesting the event that caused his cardiac arrest was severe.

percent of people who experience pulmonary embolisms do survive, those who have suffered cardiac arrest on arrival at the hospital have a 95 percent mortality rate. Additionally, 80 percent of patients who are put on mechanical ventilation die, and 77 percent of those who receive CPR will die.

Dr. David Bach, an expert in cardiology, concurred that Ilczyszyn's massive pulmonary embolism was not survivable. A massive pulmonary embolism will likely lead to cardiac arrest. Only a mechanical disruption of the clot can stop this progression. Without treatment, cardiac arrest will occur within the first two hours of onset, but it can occur within seconds.

Dr. Bach noted that a pulmonary embolism is a mass that interrupts normal blood circulation by creating a mechanical obstruction inside the pulmonary artery. He opined that the first responders were able to get a return of spontaneous circulation because they used a number of heroic measures, like CPR, epinephrine, and intubation, plus they shocked him three times. However, death was still likely because of the underlying problem, namely, the blockage affecting the heart's ability to pump. The fact that Ilczyszyn's blood pressure stayed up before he died was, in part, related to all the medications he was receiving to support blood pressure and the medical interventions that he had received.

Dr. Bach opined that even if the pulmonary artery blockage is incomplete, a clot is considered to be a "massive" pulmonary embolism if it causes a drop in blood pressure. Ilczyszyn's pulmonary embolism lowered his blood pressure, as demonstrated by his inability to communicate while he was in the lavatory. Consistent with other expert testimony, Dr. Bach explained that giving oxygen will not help prevent cardiac arrest in such cases because the problem is not that there is a lack of oxygen in the airways; the problem is that the heart is not able to pump blood into the lungs to pick

17

up the oxygen. Also, oxygen does not treat right ventricular dysfunction, and the supportive measures available on the plane would not have prevented the pulmonary embolism from progressing to cardiac arrest. Supplemental oxygen will not increase a patient's blood pressure, and intravenous fluids also will not help. The appropriate treatment would have been with drugs that dissolve blood clots, or some kind of mechanical disruption, either surgery or catheter based. But cardiac arrest can occur so quickly that these disruption options cannot always be taken in time.

Dr. Mitchell Garber also testified as an expert witness for Southwest. He is a medical doctor who specializes in aerospace medicine. He helped prepare an animation of a massive pulmonary embolism that was played for the jury.[11] The animation showed a blood clot in the leg breaking off and moving up towards the heart.[12] The blood vessels widen as they get closer to the heart, so there is less and less resistance as the blood clot travels. The clot goes into the right atrium and proceeds through the right ventricle, lodging in the pulmonary arteries. The pulmonary arteries are narrower than the blood vessels that lead to the heart and the clot has nowhere to go. It coils up inside the "pulmonary trunk,"[13] compressing into something that

---

[11] Plaintiffs' expert Dr. Fishbein disagreed with Southwest's representation that Ilczyszyn's clot was two feet long. He had never seen a clot that long in a leg vein, and a clot of that length would have involved much more tissue than was described in the autopsy report. He also challenged the animation, which showed an almost complete blockage of the pulmonary trunk. Such a condition was not described in the autopsy report and was inconsistent with the manner of death.

[12] The vast majority of pulmonary thromboemboli come from clots in the lower leg.

[13] The pulmonary trunk is the outflow vessel from the heart. It splits into the right pulmonary artery and the left pulmonary artery.

looks like a big knot.  Some blood will get around this obstruction, but the vast majority of blood will be blocked off.  Blood is thus impeded from reaching the lungs to receive oxygen.  This results in oxygen deficiency in tissues and vital organs like the brain, leading to severe complications.

Dr. Garber explained that if a person's brain does not get enough oxygen, he or she will become unconscious and will suffer brain damage within three to 10 minutes.[14]  In the case of a massive pulmonary embolism like the one Ilczyszyn had, the person would survive about 10 minutes before suffering permanent brain damage.  Dr. Garber noted that while there was no evidence of a pulmonary trunk blockage at the time of autopsy, the passage of time would have reduced the clot.  Also Ilczyszyn underwent extensive CPR, which would have affected the structure of the clot.

Dr. Garber testified that the vast majority of people with a massive pulmonary thromboembolism do not survive.  About 50 percent suffer cardiac arrest and die within the first 30 minutes.  Even though medical personnel were able to restart Ilczyszyn's heart, this did not resolve the underlying problem.  By then the brain damage had already occurred.  Cardiac arrest was largely inevitable as the end result of this pulmonary embolism.  If the clot had only been blocking 50 percent of the pulmonary artery, there would have been sufficient blood flow to avoid cardiac arrest.  The body does have a natural process for dissolving clots, but here the clot was too large.  Dr. Garber opined that Ilczyszyn could not have survived even if the embolism had occurred while he was in a hospital, and nothing could have been done on the airplane to save him.

---

[14] A laceration on the bridge of his nose suggested that Ilczyszyn lost consciousness and hit his head on something in the lavatory.  Even if he was unconscious, he still could have made noise.

### c.    *Plaintiffs' Rebuttal Witness*

Pulmonologist Dr. Leslie Stricke stated that when treating a patient with a pulmonary embolism, the first thing he will do is give the patient oxygen. An "Ambu bag,"[15] which was available on the airplane, is a very effective way of delivering oxygen, delivering close to 100 percent oxygen. An Ambu bag will not only help to deliver oxygen, it will also blow off the carbon dioxide by ventilating the lung. If Ilczyszyn had been given oxygen through the Ambu bag, his heart would have kept working, his blood pressure would not have dropped, and he would not have had cardiac arrest.

Dr. Stricke stated that while Ilczyszyn did have a 1.5-centimeter blockage, there was still space for blood to go around. Even when a person's blood-oxygen level is low, blood that is saturated with oxygen will get to the brain and the heart. Ilczyszyn's coronary arteries were functioning very well, and his heart could have acquired oxygen through coronary circulation, which would not have been affected by a blood clot in the pulmonary artery.

Dr. Stricke disagreed with the defense position that even if Ilczyszyn had been given 100 percent oxygen he still would have had cardiac arrest and died. Oxygen would have improved his heart function and would have prevented major brain injury. In Dr. Stricke's experience, the patient survival rate is over 80 percent for persons with clots in their left and right pulmonary arteries. This view is supported by medical literature. However, on cross-examination, Dr. Stricke agreed that the size of a clot is relevant to mortality.

---

[15] An Ambu bag is an inflatable bag that is attached to a face mask. When the device is secured to an oxygen bottle and the mask is pressed over the patient's airway, oxygen can be forced into the lungs by squeezing the bag.

### 4. Economic Damages Testimony

Ilczyszyn had worked as a commodities broker since 2005. His annual income was about $250,000 per year up until 2011, when he started his own brokerage firm and earned $370,000 in his first year. Before he died in September 2014, he had already earned $423,000 for 2014.

Plaintiffs' economist expert witness Stan Smith analyzes wage loss in wrongful death and personal injury cases. He opined that had Ilczyszyn survived, he would have earned a little over $1.5 million from the date of his death to the time of trial. As to future loss of earnings capacity, Smith assumed that his wages would grow at a rate of 1 percent a year above inflation. Assuming he had continued to work through age 75, Ilczyszyn would have earned almost $11 million.

Southwest's economist expert witness Mark Cohen calculated past lost income support at $804,775. For future income support, Cohen testified that Ilczyszyn would have provided almost $2.3 million for an average work life expectancy, and almost $2.7 million had he retired at age 65.

## D. Closing Arguments

During their closing argument, plaintiffs' attorneys argued that if Ilczyszyn had been given supplemental oxygen on the airplane his blood pressure would not have dropped, he would not have had cardiac arrest, and he would have survived. They asked the jury to award Kelly and Ilczyszyn's minor child a total of $20 million each in damages, and $5 million each in damages to his two adult children.

In addition to arguing against a finding of negligence, Southwest's attorney challenged plaintiffs' theory of causation, asserting that Ilczyszyn's death was caused by his massive pulmonary embolism. Counsel emphasized that patients with this condition will die 65 to 95 percent of the time, and

21

that the vast majority of these patients die within 30 minutes of onset. Counsel stressed that this condition was so serious that even if the crew had done everything right Ilczyszyn still would have died.

## E. Jury's Verdict

On July 19, 2019, the jury returned its special verdict finding that Southwest was negligent but that the negligence was not a substantial factor in causing Ilczyszyn's death.

Judgment in favor of Southwest was filed on August 26, 2019. This appeal followed.

## II.

## DISCUSSION

## A. Standards of Review

Plaintiffs' primary contention on appeal is that the trial court erred in concluding that section 44941 confers absolute immunity from liability for any act or omission occurring after the disclosure of an airline security threat, including conduct that merely establishes causation. They assert that the court's immunity ruling "categorically barred" them from introducing "virtually all of their causation evidence at trial," and resulted in jury instructions that made it "virtually impossible" for them to causally link Ilczyszyn's death to Southwest's negligence. They further complain that the court permitted Southwest to "weaponize Section 44941" by allowing it to introduce evidence of the flight crew's own good conduct following Phase 1, conduct that plaintiffs were not allowed to impeach or rebut.

Trial courts ordinarily enjoy broad discretion with respect to the admission and exclusion of evidence in ruling on motions in limine. (*Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288, 1294.) Nonetheless, that discretion "is limited by the legal principles applicable to the case." (*Ibid*.)

22

Where a trial court's exclusion or admission of evidence " ' "transgresses the confines of the applicable principles of law," ' " it is an abuse of discretion. (*Ibid*.) Additionally, "[t]he legal adequacy of jury instructions is a legal issue subject to the de novo standard of appellate review." (*Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 24 (*Isip*).)

## B.    *Additional Background*

As noted above, the trial court partially granted motion in limine No. 4, ruling that section 44941 immunized Southwest from liability for conduct occurring after Klotz informed Walker of the potential security threat, i.e., after Phase 1. The court rejected plaintiffs' request to limit the immunity to the crew's verbal statements only, ruling that the immunity also extended to "the subsequent events that result[ed] from the statement[s]." Citing to *Baez v. JetBlue Airways Corp.* (2d Cir. 2015) 793 F.3d 269 (*Baez*), the court explained that restricting the immunity to the verbal statements would render the immunity effectively "meaningless."

Because Southwest could not be held liable for post-Phase 1 conduct, the trial court limited the evidence and argument that plaintiffs could offer to the jury with respect to conduct occurring during Phases 2, 3, and 4. For example, plaintiffs were barred from suggesting to the jury that the pilots could have selected a different flight path, air speed, or airport to effect an emergency landing.

Shortly before opening statements, the parties again argued about the scope of motion in limine No. 4, this time with respect to the element of causation. Southwest indicated that plaintiffs were proceeding under two causation theories. First, that Ilczyszyn's pulmonary embolism would not have progressed to cardiac arrest had he received treatment, such as oxygen, on the aircraft. And second, that the cardiac arrest he did suffer would not

23

have been fatal had he promptly received treatment at the airport's arrival gate.

As to this second theory, Southwest asserted that any delay in treatment would be relevant only if its employees could be blamed for the delay. However, because the court had ruled that Southwest was immune from civil liability for conduct occurring after Phase 1—including the decision to have law enforcement officers meet the airplane at the arrival gate rather than paramedics—Southwest maintained that plaintiffs should not be allowed to pursue their second causation theory. Plaintiffs countered that they were prepared to present this theory without arguing that law enforcement caused the delay. They also claimed Southwest had conceded from the outset that they could present their delay-based theory of causation.

The trial court ruled in favor of Southwest, stating, "[T]he immunity, once it attaches, attaches. [¶] And the defendants cannot be found civilly liable. It's black letter in the statute for any of the subsequent actions that arose from the report." The court continued, "And I'm not going to interject into the record and into the jury's consideration facts that cannot be permitted to form the basis for liability on the part of defendants." With this background in mind, we turn to our analysis.

## C. *Section 44941 Immunity*

### 1. **The Statute**

In 2001, Congress created the Transportation Security Administration (TSA) "to assess and manage threats against air travel" following the events of 9/11. (*Air Wisconsin Airlines Corp. v. Hoeper* (2014) 571 U.S. 237, 241 (*Air Wisconsin*).) The Aviation and Transportation Security Act (49 U.S.C. § 44901 et seq.; ATSA) was enacted to "shift[] from airlines to the TSA the responsibility 'for assessing and investigating possible threats to airline

24

security.'" (*Air Wisconsin*, at p. 248; see also *Baez, supra,* 793 F.3d at p. 276 ["Judgment calls about how to act on such reports are the province of the TSA and other law enforcement officers"].) "To ensure that the TSA would be informed of potential threats, Congress gave airlines and their employees immunity against civil liability for reporting suspicious behavior." (*Air Wisconsin,* at p. 241.) The immunity contained in section 44941 was included in the ATSA "to ensure that air carriers and their employees would not hesitate to provide the TSA with the information it needed." (*Air Wisconsin*, at pp. 248–249.)

In relevant part, section 44941(a) provides:

> "Any air carrier . . . or any employee of an air carrier . . . who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism . . . to any . . . Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, for such disclosure."

This immunity is lost only if the disclosure is made with "actual knowledge that the disclosure was false, inaccurate, or misleading," or made with "reckless disregard" as to the truth or falsity of the disclosure. (49 U.S.C. § 44941(b) (section 44941(b)).)

### 2. Plaintiffs' Contentions

Plaintiffs contend that the plain language of section 44941 limits the grant of immunity to torts that arise solely from the verbal statements that are used to disclose security threats, and not to torts arising from the conduct that follows from such disclosures. They emphasize that the statute confers immunity on those who make a "voluntary disclosure" of a security threat by providing that such persons may not be held "civilly liable . . . for such

25

disclosure." From this language, they reason that the immunity extends only to claims where the disclosure itself is the tortious act giving rise to liability, and not to claims arising from ancillary tortious conduct even where such conduct is "coincident with a disclosure."

Specifically, plaintiffs assert that section 44941's immunity "does not extend to the manner in which Flight Attendants are required to identify medical emergencies and provide medical aid, even where such identification results in a disclosure of suspicious activity. In other words, . . . liability arising from a negligent identification of a medical emergency and failure to provide aid is not liability arising from a 'voluntary disclosure' of suspicious activities." To interpret the statute otherwise, they claim, "would be to impermissibly read Section 44941 beyond the clear limitation imposed by the phrase 'for such disclosure.' " These contentions require us to construe section 44941.

### 3. Principles of Statutory Interpretation

"The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] 'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." ' [Citations.] . . . Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) "[I]f the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.] In the end, we ' "must select the construction that comports most

26

closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003.)

### 4. Section 44941 Analyzed in *Air Wisconsin*

Section 44941 must be construed to promote the intent of Congress. (See *Kimmel v. Goland* (1990) 51 Cal.3d 202, 208 ["Our analysis starts from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent."].) As plaintiffs note, the legislative history of section 44941 does not offer much insight into the intended scope of its applicability.[16] While the precise issue here appears to be one of first impression, several courts have interpreted section 44941 in other factual contexts, including the United States Supreme Court.

The high court considered section 44941 in *Air Wisconsin, supra,* 571 U.S. 237. That case concerned statements uttered by airline personnel who reported to TSA agents that a disgruntled, recently terminated pilot had boarded a flight. (*Id.* at pp. 241–244.) The airline supervisor who spoke to TSA said that the plaintiff, who was authorized to carry a firearm on an airplane, might have been armed and that the airline was " 'concerned about his mental stability and the whereabouts of his firearm.' " (*Id.* at p. 244.) He described the plaintiff as "an '[u]nstable pilot' " who had just been terminated. (*Ibid.*) In reality, the plaintiff had engaged in a single emotional outburst after failing his final opportunity to pass a required flight simulator

---

[16] "[T]he legislative history does not provide guidance as to the type of immunity intended by Congress. No prior versions of the bill exist, and Congress engaged in no discussion of the immunity standard." (*Air Wisconsin Airlines Corp. v. Hoeper* (2012 Colo.) 320 P.3d 830, 837, reversed and remanded in *Air Wisconsin, supra,* 571 U.S. 237.)

test and had not yet been terminated. (*Id*. at p. 242.) The TSA responded to the call by ordering the plane to return to the departure gate where they removed the plaintiff, searched him, and questioned him about the location of his gun. (*Id*. at p. 244.) He informed the officers that his gun was at his house. After the gun was located, he was allowed to board a later flight. (*Ibid*.)

The plaintiff subsequently sued the airline in Colorado state court for defamation. (*Air Wisconsin, supra,* 571 U.S. at p. 244.) The issue of the exception to immunity for false statements under section 44941(b) was submitted to the jury, however, the jury instructions did not clarify that the immunity protects materially true statements. (*Air Wisconsin*, at pp. 244–245.) The jury ruled in favor of the plaintiff and he was awarded more than $1 million in damages. (*Id*. at p. 245.)

The judgment was affirmed by the Colorado Supreme Court. (*Air Wisconsin Airlines Corp. v. Hoeper*, *supra*, 320 P.3d 830, reversed and remanded in *Air Wisconsin, supra,* 571 U.S. 237.) In its ruling, the Colorado high court held that the issue of immunity was a question of law for the trial court and should not have been submitted to the jury. (320 P.3d at p. 837.) However, the court affirmed the judgment after finding that the airline supervisor had acted with reckless disregard as to the truth or falsity of his statements by grossly overstating the facts to the TSA agent. (*Id*. at pp. 838, 842.) In doing so, as the United States Supreme Court later observed, the court appeared to assume that "even true statements do not qualify for ATSA immunity if they are made recklessly." (*Air Wisconsin,* 571 U.S. at pp. 245–246.)

The United States Supreme Court in *Air Wisconsin* focused on whether immunity under section 44941(b) can be denied without a determination that

a disclosure was " 'made with reckless disregard as to the truth or falsity of that disclosure' " or was actually materially false. (*Air Wisconsin*, *supra*, 571 U.S. at pp. 246–250.) The court observed that "Congress patterned the exception to ATSA immunity after the actual malice standard of *New York Times Co. v. Sullivan* [(1964) 376 U.S. 254], and we have long held that actual malice requires material falsity. Because we presume that Congress meant to incorporate the settled meaning of actual malice when it incorporated the language of that standard, we hold that a statement otherwise eligible for ATSA immunity may not be denied immunity unless the statement is materially false." (*Id.* at pp. 246–247.) Because the Colorado state courts had "made no such determination, and because any falsehood in the disclosure here would not have affected a reasonable security officer's assessment of the supposed threat, we reverse the judgment of the Colorado Supreme Court." (*Id.* at p. 241.)

The *Air Wisconsin* court had no occasion to address whether ATSA immunity extends to conduct arising from the disclosure of a security threat. However, the opinion offers insight into the purpose of ATSA immunity. The high court explained that "[i]n directing the TSA to 'receive, assess, and distribute intelligence information related to transportation security,' [citation], Congress wanted to ensure that air carriers and their employees would not hesitate to provide the TSA with the information it needed. This is the purpose of the immunity provision, evident both from its context and from the title of the statutory section that contained it: 'encouraging airline employees to report suspicious activities.' [Citation.] It would defeat this purpose to deny immunity for substantially true reports, on the theory that the person making the report had not yet gathered enough information to be certain of its truth. Such a rule would restore the pre-ATSA state of affairs,

29

in which air carriers bore the responsibility to investigate and verify potential threats." (*Air Wisconsin*, *supra*, 571 U.S. at pp. 248–249.)

### 5. Section 44941 Immunity Is Not Limited to Disclosures

Citing to section 44941(b) and the *Air Wisconsin* court's references to the *New York Times*[17] malice standard, plaintiffs argue that the statute "demonstrates a legislative intent to have its immunity targeted at civil liability analogous to defamation. Thus, the operative, liability-creating conduct for which Section 44941 is intended to provide immunity is the voluntary disclosure itself, not civil liability for which the disclosure is merely incidental or ancillary." We are not persuaded.

While the *Air Wisconsin* court discussed the *New York Times* malice standard, the high court did not suggest that section 44941 immunity is limited to defamation or other reputation-based torts. The court merely noted that in the context of section 44941, "a materially false statement is one that ' "would have a different effect on the mind of the [listener] from that which the . . . truth would have produced." ' " (*Air Wisconsin, supra,* 571 U.S. at p. 250.) The "listener" in this case is a reasonable security officer, not a member of the general public. (*Id.* at p. 251.) Thus, in this context, a passenger's reputation is essentially irrelevant, as here "we care whether a falsehood affects the authorities' perception of, and response to, a given threat." (*Id.* at pp. 250–251.)

Plaintiffs rely on *Gonzalez v. Paradise Valley Hospital* (2003) 111 Cal.App.4th 735, 741 (*Gonzalez*) to support their interpretation of section 44941. In *Gonzalez*, the plaintiffs sued a hospital and physicians after their son was killed by police officers following his escape from the

---

[17] *New York Times Co. v. Sullivan*, *supra*, 376 U.S. 254 (*New York Times*).

hospital's psychiatric unit during an involuntary 72-hour hold. The trial court granted summary judgment to the defendants after determining that Welfare and Institutions Code section 5278 immunized them from liability for any negligence occurring during a 72-hour hold. (*Gonzalez*, at pp. 738, 739.) The appellate court reversed. (*Id.* at p. 737.)

The statute conferring immunity in *Gonzalez* provided, in relevant part: "Individuals authorized under this part to detain a person for 72-hour treatment and evaluation . . . shall not be held either criminally or civilly liable *for exercising this authority* in accordance with the law." (Welf. & Inst. Code, § 5278, italics added.) The defendants argued that any negligent conduct committed during a legal 72-hour hold fell within the scope of this immunity. (*Gonzalez*, *supra*, 111 Cal.App.4th at p. 740.) The appellate court disagreed, concluding that the immunity was limited to the conduct used to effectuate the detention. (*Id.* at pp. 741–742.)

The *Gonzalez* court reasoned that the Legislature intended to restrict the immunity to the detention because " '[w]ithout the immunity provided by [Welfare and Institutions Code] section 5278, an involuntary detention and treatment without consent would arguably constitute kidnapping, false imprisonment, or battery.' " (*Gonzalez*, *supra*, 111 Cal.App.4th at p. 741.) The court explained that "[t]he protected conduct is confined to the *exercise* of statutory authority to detain, evaluate and treat against the patient's wishes, and does not extend to the *manner* in which evaluation and treatment are carried out. In other words, liability arising from negligent evaluation or treatment is not liability arising from the 'exercis[e of] this authority in accordance with the law.' " (*Id.* at pp. 741–742.) The court observed that "[t]he interpretation of [Welfare and Institutions Code] section 5278 the defendants urge is contrary to its language, and would undermine a purpose

31

of the Legislature in enacting the [Lanterman-Petris-Short] Act, protection of mentally ill persons." (*Id.* at p. 742.)

Using the *Gonzalez* reasoning, plaintiffs argue that "liability arising from a negligent identification of a medical emergency and failure to provide aid is not liability arising from a 'voluntary disclosure' of suspicious activities." In their view, Congress intended "to limit the immunity to only that civil liability arising from a qualifying voluntary disclosure," rather than providing a "blanket immunity" for all conduct occurring after such a disclosure. They urge that had Congress intended to provide a blanket immunity it could have done so by, among other alternatives, excluding the qualifier "for such disclosure" from the statute. We conclude that section 44941's immunity is not as narrow as plaintiffs suggest.

Section 44941's immunity is distinguishable from the immunity discussed in *Gonzales*. In *Gonzales,* the appellate court's interpretation was consistent with the legislative intent to protect mentally ill persons by allowing hospitals to involuntarily restrain them when they present a danger to themselves or others. That appellate court's decision to limit the immunity to the act of detention was consistent with that legislative intent. A health care provider's conduct towards a patient following an involuntary detention is not controlled by the detention. Once the detention is accomplished, the resulting hold provides the context in which professional negligence may or may not occur. But in the present case, the consequences of disclosing a security threat cannot be so easily separated from the disclosure itself.

The ATSA grants immunity to private air carriers to encourage their employees to act on issues of public importance, such as avoiding air piracy and threats to national security, without fear of consequences, even if their actions turn out to have been based on mistaken assumptions. The text of

32

the ATSA itself makes clear there is immunity for reporting "any suspicious transaction relevant to a *possible violation* of law or regulation, relating to air piracy, *a threat* to aircraft or passenger safety, or terrorism." (49 U.S.C. § 44941(a).) The legislators who enacted the ATSA undoubtedly believed that "the safety and security of the civil air transportation system is critical to the security of the United States and its national defense." (H.R. Rep. No. 107-296, 1st Sess., p. 53 (2001).)

As the *Air Wisconsin* court stated, "The ATSA shifted from airlines to the TSA the responsibility 'for assessing and investigating possible threats to airline security.' " (*Air Wisconsin*, *supra*, 571 U.S. at p. 248.) Under section 44941, airline employees are relieved of the responsibility of confirming whether an actual threat exists in order to "encourage air carriers and their employees, often in fast-moving situations and with little time to fine-tune their diction, to provide the TSA immediately with information about potential threats." (*Air Wisconsin*, at p. 253.)

The importance of this immunity cannot be overstated. Air carriers and their employees are ideally positioned to provide timely, useful threat information to TSA agents because they directly interact with each passenger. Considering the importance of the threat disclosure encouraged by the ATSA, and the unique position of air carriers to obtain information about those threats, we conclude that Congress intended to confer upon air carriers the greatest possible degree of protection by enacting section 44941. We also observe that section 44941 provides that airline employees who make a "voluntary disclosure of any suspicious transaction . . . shall not be civilly liable to any person *under any law* . . . for such disclosure." (49 U.S.C. § 44941(a), italics added.) On its face, the statute does not limit the

33

immunity's scope to claims that may arise from inappropriate disclosures, such as defamation or slander.

We conclude that the immunity under section 44941 may be extended to the conduct that arises from security threat disclosures. As the trial court here observed, limiting this important immunity to a disclosure only, and denying immunity to the conduct that flows from the disclosure, would defeat the purpose of the immunity and render it essentially meaningless. The limitation that plaintiffs seek to place on the immunity turns the TSA's " ' "when in doubt, report" ' "[18] policy on its head. By its very nature, a report of a suspicious incident to the TSA—like the report at issue in this case—is a tentative assessment of an evolving situation based on imperfect information. "Baggage handlers, flight attendants, gate agents, and other airline employees who report suspicious behavior to the TSA should not face financial ruin if, in the heat of a potential threat, they fail to choose their words with exacting care."[19] (*Air Wisconsin, supra,* 571 U.S. at pp. 253–254.)

We also note that airlines and their employees have an obligation to report potential threats or risk being subject to civil penalties. (See 49 U.S.C. §§ 44905(a), 46301(a)(1)(A).) If airlines and their employees understand that they face liability in this context, they will be forced to "gather[] enough

---

[18] See *Baez*, *supra*, 793 F.3d at page 276.

[19] Evidence was offered at trial showing that once a security threat is declared, flight crews are required to follow federally mandated safety protocols, which we will not describe here because they are confidential and contained in the sealed record. These protocols resulted in Ilczyszyn being left alone in the lavatory without medical attention during the final stages of the flight. Assuming that disclosing a threat is made in good faith, subjecting an airline and its employees to potential liability for following mandatory federal safety protocols would be contrary to the goal of ensuring public safety.

information to be certain of [a statement's] truth" before making a security report. (See *Air Wisconsin*, *supra*, 571 U.S. at p. 249.) This would "restore the pre-ATSA state of affairs, in which air carriers bore the responsibility to investigate and verify potential threats." (*Ibid.*)

*Baez*, *supra*, 793 F.3d 269, which the trial court cited to in its ruling on motion in limine No. 4, further supports the conclusion that section 44941 immunity does not attach solely to claims that arise from communication-based torts. In *Baez*, the plaintiff timely checked her luggage in for a flight but appeared at the gate for the flight only minutes before its scheduled departure. (*Baez*, at p. 272.) The gate agent informed her that the airplane's door was closed and that she could not board the flight, to which the plaintiff replied, " 'Isn't it a security risk to let a bag go on a plane without a passenger, what if there was a bomb in the bag?' " She also disparaged the effectiveness of the TSA. (*Ibid.*) The gate agent alerted her supervisor, and the airline contacted security personnel, the TSA, and the FBI. (*Id.* at pp. 272–273.) Security personnel detained and questioned the plaintiff, and she was then questioned at length by law enforcement agents. As a security measure, the airline and law enforcement decided to reroute the airplane carrying the plaintiff's luggage. After landing, security officers searched her luggage and found no bomb. She was ultimately charged with making a false bomb threat. (*Id.* at p. 273.) She later brought various state law claims against the airline and the gate agent, including claims for false arrest and intentional infliction of emotional distress. The district court granted summary judgment to the defendants as to all causes of action based on ATSA immunity. (*Baez*, at pp. 271–272.)

The Second Circuit affirmed, agreeing with the district court's observation that "a passenger who speculates aloud about whether there is a

bomb in her luggage cannot be heard to complain when an airline representative reports the use of those words, even if the passenger's precise words are misrepresented." (*Baez*, *supra*, 793 F.3d at p. 276.) The appellate court noted that there were discrepancies between the statements that the plaintiff conceded she had made and the statements the gate agent allegedly reported to law enforcement officials. However, the court concluded that the differences were " 'immaterial' " for purposes of ATSA immunity, noting that "since [the plaintiff's] luggage was indisputably a checked bag unaccompanied by its owner, 'a reasonable [law enforcement] officer . . . would have wanted to investigate.' " (*Baez*, at p. 275.) The court concluded that the defendants were entitled to ATSA immunity, as "no reasonable jury could find that differences in wording" in the accounts "constituted materially false statements made to law enforcement." (*Baez*, at p. 276.)

Plaintiffs challenge the trial court's reliance on *Baez*, reasoning that the case merely holds "that claims arising from the disclosure of statements made by the passenger were only subject to Section 44941's immunity in the first place if the voluntary disclosure caused law enforcement to respond, resulting in harm—i.e., the disclosure was the operative act at the heart of the claim." We do not view the case so narrowly.

The *Baez* court observed that the "*adverse consequences* to [the plaintiff] flowed from the decisions made by such law enforcement officers." (*Baez*, *supra*, 793 F.3d at p. 276, italics added.) We can infer that these "adverse consequences" were not based solely on the statements themselves, as the defendants were held to be immune not just from the plaintiff's claim for defamation, but also for her claims for negligent employment, false arrest, and intentional infliction of emotional distress. (*Id.* at p. 273). These causes of action did not arise from the statements themselves, but were based on the

36

actions taken in response to the gate agent's report of a security threat. Thus, *Baez* supports a broader interpretation of section 44941 than what plaintiffs advocate. In sum, under the facts at issue here, we conclude that the trial court did not err in ruling that ATSA immunity attaches to conduct that arises from a disclosure of a security threat.

### 6.    Other Federal Cases Addressing Section 44941

In support of their argument that the immunity for reporting suspicious activities "specifically applies to the disclosure of suspicious activities, not the actions taken pursuant thereto' " (bold and italics omitted), plaintiffs cite several federal district court cases, *Bayaa v. United Airlines, Inc.* (C.D.Cal. 2002) 249 F.Supp.2d 1198 (*Bayaa*), *Dasrath v. Continental Airlines, Inc.* (D.N.J. 2002) 228 F.Supp.2d 531 (*Dasrath*), *Shqeirat v. U.S. Airways Group, Inc.* (D.Minn. 2007) 515 F.Supp.2d 984 (*Shqeirat*), and *Bandary v. Delta Air Lines, Inc.* (C.D.Cal., Oct. 11, 2019, No. EDCV-17-1065DSF (ASx)) 2019 U.S.Dist. Lexis 232295 (*Bandary*). They assert that these opinions "uniformly hold that Section 44941 [neither] bars civil liability for the acts of air carriers and their employees which are independent of a disclosure, nor bars civil liability for independent injurious conduct merely because it arises after a disclosure." Southwest counters that plaintiffs rely on dictum from the first three cases, all of which are distinguishable in that they involve claims of intentional racial discrimination and predate *Air Wisconsin*. Southwest also claims that *Bandary* contradicts plaintiffs' position. Southwest has the better argument.

In *Bayaa,* the plaintiff alleged a claim for unlawful discrimination stemming from an incident in which he was removed from an airplane after the crew allegedly became uncomfortable for no discernable reason except that he was an Arab-American. (*Bayaa*, *supra*, 249 F.Supp.2d at p. 1200.)

37

Thereafter, he filed a civil rights action (*ibid.*) asking the district court to declare illegal the airline's "alleged pattern and practice of removing individuals from flights based on perceived Middle Eastern ethnicity, and to enjoin [the airline] from engaging in this conduct in the future." (*Id.* at p. 1205.) The airline filed a motion to dismiss for failure to state a claim. (*Id.* at p. 1200.) In part, the airline argued that an order requiring it to comply with the civil rights laws would conflict with its duty to deplane passengers under 49 United States Code section 44902, which allows airlines to exercise their discretion to refrain from transporting passengers that they decide might be "inimical to safety." (49 U.S.C. § 44902(b).) It also argued compliance would conflict with the immunity under section 44941. (*Bayaa*, at p. 1205.) The district court dismissed the first argument, stating that the airline's duty under 49 United States Code section 44902 "does not grant them a license to discriminate." (*Bayaa*, at p. 1205.) In dicta, and without any analysis, the court also wrote that section 44941 immunity "specifically applies to the *disclosure* of suspicious activities, not the actions taken pursuant thereto." (*Bayaa*, at p. 1205.)

Similarly, in *Dasrath*, *supra*, 228 F.Supp.2d 531, passengers alleged claims for unlawful racial discrimination against an airline after being ejected from a flight. (*Id.* at p. 533.) The airline filed a motion to dismiss, arguing that it was entitled to immunity under 49 United States Code sections 44902 and 44941. (*Dasrath,* at p. 537.) Like the court in *Bayaa,* the *Dasrath* court held that the plaintiffs had sufficiently alleged their removal was a product of "intentional racial discrimination," and "not the sort of rational safety measure shielded by [section] 44902." (*Dasrath*, at pp. 539–540.) The *Dasrath* court also rejected the airline's invocation of section 44941 immunity, concluding that the argument "appears not to have any relevance

38

to the asserted claims and accordingly does not provide any basis for dismissing them." (*Dasrath*, at p. 537.)

As in the *Bayaa* decision, the court in *Dasrath* engaged in a limited analysis of section 44941: "By its terms the law provides shelter not to actions taken on the basis of disclosures but rather to the disclosures themselves. Such immunity as the statute provides accordingly does not reach the conduct on which [the] [p]laintiffs predicate their claims. As the complaints themselves indicate, and as [the] [p]laintiffs' opposition papers confirm, [the] [p]laintiffs base their claims on the ultimate decision to remove [them] from [the flight], and on an alleged pattern of similar actions, not on any communications that might have been incidental to such actions. Section 44941 is therefore irrelevant to the asserted causes of action." (*Dasrath*, *supra*, 228 F.Supp.2d at p. 538.)

*Shqeirat*, *supra*, 515 F.Supp.2d 984 involved Muslim passengers who brought multiple claims, including a claim for false arrest, against an airline and a police department after they were removed from an airplane. (*Id.* at pp. 990–991.) In its summary judgment motion, the airline asserted that it was entitled to immunity from the claim for false arrest under section 44941. (*Shqeirat*, at p. 1000.) The district court held that the statute protected the airline employees' disclosures to the police department. (*Ibid.*) However, the court noted the plaintiffs had alleged "that in addition to disclosing information to [the police officers], [the airline] acted in concert with [the police department] to arrest [the] [p]laintiffs. [The] [p]laintiffs specifically allege that immediately after they were handcuffed and placed under arrest, a [police officer] stated: 'This is the airline's call and not our call.' " (*Ibid.*) Without any analysis, the district court summarily concluded that the

39

"[p]laintiffs' false arrest claim alleges conduct by [the airline] that falls outside the protection of [section] 44941(a)." (*Ibid.*)

In *Bandary*, the district court reached a different conclusion. The case involved a confrontation between a passenger and the flight crew which led to the passenger's arrest and criminal prosecution. (See *Bandary v. Delta Air Lines, Inc.* (C.D.Cal. Mar. 5, 2019, No. EDCV 17-1065 DSF (ASx)) 2019 U.S.Dist. Lexis 78002, at pp. *1–*4.) In ruling on motions in limine regarding the airline's "potential liability for the actions of law enforcement both during disembarkment and in a later criminal prosecution of [the plaintiff]," the court described the parties' dispute as follows: "[The] [d]efendant would apply a broad immunity for any harm that might have been suffered stemming from the report to law enforcement. [The] [p]laintiff would apply a narrow immunity that apparently would only apply to harms arising directly out of the report itself—presumably such things as slander or malicious prosecution. The Court finds that the language and purpose of [section] 44941(a) support the application of broad immunity. Implicit in immunity for making reports to law enforcement is immunity from liability for whatever law enforcement might do with those reports. Otherwise, immunity would be largely meaningless. The purpose of [section] 44941(a) is to encourage reports to law enforcement. That purpose would clearly be undercut if airlines and airline personnel would be potentially liable for the independent actions of law enforcement after a report was made." (*Bandary*, *supra*, 2019 U.S.Dist. Lexis 232295 at pp. *3, *6–*7.)

Plaintiffs assert that the four district court decisions above "uniformly hold" that section 44941 does not bar civil liability for acts that are independent of a disclosure, or that arise after a disclosure. However, none of the three cases plaintiffs principally rely on—*Bayaa*, *Dasrath*, and *Shqeirat*—

40

are persuasive as none of the opinions contains a reasoned analysis. We therefore decline to follow them. In our view, the *Bandary* case contains the most reasoned analysis, and that analysis actually runs counter to plaintiffs' contentions.

In sum, based on our analysis of applicable law in the context of the facts presented here, we hold that the trial court did not err in applying section 44941 immunity to the conduct of the flight crew following the crew's determination that Ilczyszyn posed a security threat to the aircraft and passengers of Flight 4640.[20]

## D. The Trial Court's Ruling Was Not a "Blanket Exclusion"

Plaintiffs next argue that the trial court misapplied the section 44941 immunity and abused its discretion by improperly excluding "all" postdisclosure evidence, including evidence of causation. They contend that the "categorical exclusion of all or almost all causation evidence caused prejudice per se." As an example, they note that the airplane continued flying for approximately 20 minutes after Phase 1, with an additional four minutes spent taxiing to a gate. They maintain that during this time there was no evidence that anyone in the plane received directions or instruction from law enforcement or security personnel. On that basis, they claim the actions taken by the flight crew were both admissible and relevant to

---

[20] Plaintiffs assert that the trial court's interpretation of section 44941 creates an absurd result. They argue that a blanket immunity for all acts or omissions following a security-threat disclosure essentially immunizes an airline from all duties owed to a passenger, and would have immunized Southwest from liability if the flight attendants had accessed the lavatory and physically assaulted Ilczyszyn after the threat was reported. Thankfully, such facts are not before us and we need not speculate as to whether immunity would attach under such a scenario.

41

establish causation and liability. For several reasons, we find no abuse of discretion.

First, as we have already determined, the trial court did not err in ruling that section 44941 immunity applies not just to the disclosure of a security threat, but also to conduct occurring in conjunction with the disclosure. This ruling did doom plaintiffs' second causation theory; namely, that Ilczyszyn would have survived had the airplane been met by medical personnel upon arrival rather than by law enforcement. However, as the court correctly determined, the delay in treatment was inextricably entwined with the flight crew's report of the security threat and the sheriff's deputies' decision to deplane the aircraft. As such, plaintiffs' second causation theory ran afoul of the section 44941 immunity.

Second, even if the flight crew received no directions from security or law enforcement during the 24 minutes that it took for the airplane to arrive at the gate, the crew was required to follow TSA-mandated security protocols. Nothing in the record suggests that the flight crew had the discretion to ignore these protocols. The crew was, in effect, operating under the direction of law enforcement at all times after Phase 1.

More fundamentally, however, our review of the record shows that the trial court did *not* extend a "blanket exclusion" as to all evidence following Phase 1. The trial court allowed plaintiffs to introduce evidence regarding the events that transpired after Phase 1 to support their first theory of causation. For example, they were allowed to show the jury that medical personnel were able to stabilize Ilczyszyn's oxygen levels and cardiac rhythms after the airplane landed. Information from the medical records prepared by first responders and the hospital were also used to support plaintiffs' medical experts' testimony that he could have been saved had

42

lifesaving measures been provided during Phase 1.  Plaintiffs were also allowed to show that the same medical interventions that paramedics used to revive Ilczyszyn on the ground were available on the airplane, including CPR, oxygen, and a defibrillator.

Plaintiffs' other arguments fare no better.  They assert that they were precluded from presenting evidence to the jury that the lifesaving measures available during Phase 1 "could have also been taken throughout the period of time following the [security threat disclosure], and that these measures also would have potentially delayed or prevented [Ilczyszyn's] cardiac arrest." However, it was essentially undisputed that, but for the security lockdown, any medical assistance started by the flight crew would have continued until landing.  Under their theory of negligence, a security threat should never have been declared and Ilczyszyn would have been provided continuing emergency medical care.

Plaintiffs also complain that they were barred from introducing evidence of negligence by the flight attendants as to their "ongoing duty to keep the Pilots informed."  They emphasize that the pilots were never told that the passenger in the lavatory was slumped over in the lavatory crying, and thus Captain Walker never had the opportunity to evaluate the situation as a medical emergency.  Yet plaintiffs succeeded in convincing the jury that the flight crew was negligent even without this evidence.

Finally, plaintiffs contend that the court essentially contradicted itself by improperly allowing Southwest to use the immunity as both a sword and a shield, allegedly giving Southwest the opportunity "to lay the evidentiary groundwork for breaking the causal chain between any negligence the jury found from prior to the communication between Klotz and Walker, and [Ilczyszyn's] cardiac arrest and death which occurred thereafter."  But the

43

evidence that Southwest was allowed to introduce had nothing to do with medical causation. Rather, the trial court explained that the evidence was relevant because plaintiffs had attacked the flight attendants' credibility by suggesting that they had "concocted this whole thing sometime after they left the plane or maybe while they were in the plane." It appears that the court was thus constrained to allow Southwest the chance "to present evidence of what transpired before the flight attendants left the plane, while they were still in temporary detention, to rehabilitate or respond to plaintiffs' attack on [their] credibility." In sum, we find no abuse of discretion in the trial court's evidentiary rulings.

## E.    *Jury Instructions*

### 1.    **Standard of Review**

Plaintiffs next argue that the trial court's special jury instruction on section 44941 immunity "legally and logically barred the jury" from linking Southwest's negligence to Ilczyszyn's cardiac arrest. We disagree.

As noted above, "[t]he legal adequacy of jury instructions is a legal issue subject to the de novo standard of appellate review." (*Isip*, *supra*, 155 Cal.App.4th at p. 24.) The appellate court independently reviews a claim of instructional error by the trial court, " 'viewing the evidence in the light most favorable to the appellant.' " (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 743.) The prejudicial error standard applies "when the jury receives an improper instruction in a civil case, prejudice will generally be found only ' "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction . . . ." ' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)

## 2. Additional Background

Following general instructions on negligence principles and causation, the trial court gave the jury the following special instruction which plaintiffs assert "woefully misstated the law":

> "You have heard testimony during the trial about communications between Captain Walker and the flight attendants that completed the period of time referred to in this trial as phase one of the events in this case. The Court has concluded that, under the law that governs this case, these communications between the flight attendants and Captain Walker, including the contents of these communications, are irrelevant to your determinations in this case. You are not to speculate about the contents of these communications for any purpose.

> "Under the law that governs this case, Southwest Airlines cannot be held liable based on these communications between the flight attendants and Captain Walker, nor based upon the content of these communications, nor based upon the consequences that followed from these communications, including subsequent decisions made by the first responders on the ground, the ambulance services provided, or the services provided at Hoag Memorial Hospital.

> "In determining whether or not Southwest Airlines is liable, you may consider only the events during the time period from the flight attendants' first awareness of a passenger's presence in the lavatory until the flight attendants commenced communications with Captain Walker. That is the relevant time frame.

> "In assessing whether Southwest Airlines is liable, you may not consider any act, omission, or consequence that followed from flight attendant Klotz's communication to Captain Walker, including subsequent decisions made by first responders on the ground, ambulance services provided, or services provided at Hoag Memorial Hospital, where Mr. Ilczyszyn was taken.

"After flight attendant Klotz made her communication to Captain Walker and then, in turn, law enforcement was notified, the decisions of what would happen to Mr. Ilczyszyn, including whether or not he would receive medical treatment, when he would receive medical treatment, and what medical treatment, if any, he would receive, was made by the first responders on the ground, the folks who provided ambulance services, and the medical staff at Hoag Memorial Hospital.

"Because Southwest Airlines had no control over the decisions made by those folks, you cannot hold Southwest Airlines liable for those subsequent decisions.

"However, you may consider the actions of the first responders, the ambulance service personnel, and the medical personnel at Hoag Memorial Hospital solely for the purpose of determining whether or not Mr. Ilczyszyn could have survived his pulmonary embolism if the flight attendants had provided basic aid and oxygen to Mr. Ilczyszyn before flight attendant Klotz communicated with Captain Walker."[21]

### 3.    Analysis

As a threshold matter, Southwest asserts that plaintiffs forfeited any challenge to the instruction because, although they objected to the giving of a limiting instruction, they helped refine the one that was read to the jury. We find no waiver. Plaintiffs had already unsuccessfully challenged the court's interpretation and application of section 44941, and the fact that they offered comments and edits to the immunity instruction that was given does not forfeit their initial objection and their right to challenge the instruction on appeal. (See *Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406 ["a party need not object if it would be futile"].)

---

[21] At several points during the trial, the trial court gave the jury admonitions containing aspects of this instruction. We confine our analysis to the special instruction quoted above as plaintiffs do not raise any separate challenges to the court's admonitions.

Plaintiffs complain that the special instruction effectively prevented them "from ever being able to prove that any negligent act occurring before the communication between Klotz and Walker caused [Ilczyszyn's] death" and "foreclosed the possibility of [Southwest's] liability in this case." They argue that because Ilczyszyn's heart "did not stop beating until the plane was landing, some 20 minutes after the Flight Attendants communicated with the pilots, the jury was unequivocally instructed that [Southwest] could not be liable for any act or omission taken by the flight attendants during this 20 minute period. In effect, in both law and logic, there was no way for the jury to causally link any negligent act to [Ilczyszyn's] death."

Plaintiffs direct us to paragraphs 5 and 6 of the jury instruction, which state that Southwest could not be held liable for any medical care that Ilczyszyn did or did not receive after the conversation between Klotz and Walker. They contend that under the instruction, "responsibility for making the decision to provide medical care . . . [was] cut off 25 minutes before the plane landed and [Ilczyszyn] went into cardiac arrest." They explain the instruction told the jury that, "whether to give oxygen and IV fluids during this 25 minute period was conclusively a decision made by first responders, for which [Southwest was] conclusively not liable." They claim that "[i]n effect, the court told the jury that the communication . . . between Klotz and Walker acted as a kind of conclusive superseding and intervening act that cut off liability for any negligence occurring prior to the communication, assigning it instead to first responders, and medical staff at Hoag Memorial Hospital. Thus, because [Ilczyszyn] did not go into cardiac arrest until after the communication, which occurred after the decisions about what would happen to [him] were taken over by first responders as a matter of law, [Southwest] could not be held liable for those subsequent decisions."

Plaintiffs claim that the instruction thereby "foreclose[d] the possibility of assigning liability for [his death] on [Southwest]."

Plaintiffs' arguments are not convincing. The jury was never told to assume that any treatment initiated by the flight attendants would have stopped after Phase 1. Nor was it instructed to disregard evidence that the flight attendants could potentially have continued providing treatment for the duration of the flight. Indeed, under plaintiffs' theory of the case, had Ilczyszyn been removed from the lavatory and been treated, there would have been no report of a potential security threat in the first place. Because the communication between Klotz and Walker would never have occurred, it could not have constituted a superseding cause. We also note that plaintiffs did not contend below that the jury instruction would prevent them from linking Ilczyszyn's death to Southwest's negligence under their first theory of causation.

In any event, the final paragraph of the instruction expressly allowed the jury to consider post-Phase 1 events in the context of causation, that is, in determining whether Ilczyszyn could have survived if the flight attendants had timely responded to his medical emergency. While the instruction did restrict the jury from finding *negligence* based on any actions taken *after* Phase 1, including the actions of law enforcement and first responders, it expressly carved out an exception for evidence of *causation* as it pertained to any negligence occurring *during* Phase 1.[22] We find no error.

---

[22] Plaintiffs assert that the jury must have been struggling with this instruction because they sent out a question asking whether any damages were required to be paid by law. They assert that this question shows that the jury was "attempting to find a way to award damages for [Southwest's] negligence in spite of being legally and logically unable to find the element of causation." The assertion is speculative. It is just as likely that the jury

48

### 4. Failure to Instruct on the Section 44941 Immunity Exception

Plaintiffs assert that the trial court erred in failing to submit the exception to section 44941 immunity to the jury. The court found there was no factual basis to support the false utterance exception under section 44941(b) and therefore this exception was not presented to the jury. While the flight attendants' statements describing their perceptions of the purported security threat may have been inaccurate, the court found they were not "materially false." Plaintiffs complain the court usurped the jury's factfinding function in deciding this issue. We disagree.

For the section 44941(b) exception to apply, plaintiffs would have to show actual malice *and* material falsity. Plaintiffs do not seriously try to show actual malice—i.e., that the flight attendants' statements that Ilczyszyn was locked in the lavatory and was refusing to come out were made " 'with knowledge that [they were] false or with reckless disregard of whether [they were] false or not.' "[23] (*Air Wisconsin, supra*, 571 U.S. at p. 247.) Nor do they convincingly argue that the statements were materially false. We note that Ilczyszyn was locked in the lavatory and did not respond to the flight attendants' requests to open the door. It was also uncontested that his foot was blocking the door. While the flight attendants did not detail in their

---

merely sought confirmation that damages are not required where, as here, there is no causation. The parties agreed at trial that the answer should simply refer the jury to the causation instructions and jury form.

[23] Of course, Ilczyszyn was suffering a horribly tragic medical event and never posed any threat. While the jury found that the flight attendants were negligent in managing his emergency before Captain Walker declared a security threat, neither plaintiffs' briefing nor the record itself suggests that the flight crew deliberately falsified any of the information that was passed on to law enforcement.

reports that he was fully clothed and was sitting with his head down, crying, " 'the gist' " of their statements was accurate.  (*Id.* at p. 255.)  There is no reason to believe that the jury would have found in favor of plaintiffs had this issue been submitted to it.

## F.    *The Gravamen of the Action Does Not Fall Outside Section 44941*

Plaintiffs assert that the trial court misapplied the section 44941 immunity because their case was not grounded on the disclosure of a threat, but rather on the flight crew's negligence in failing to identify Ilczyszyn's medical emergency and provide him timely, lifesaving aid.  They emphasize that they brought a single claim for wrongful death based on Southwest's negligence in failing to treat Ilczyszyn's medical emergency, and did not set forth a cause of action for false or misleading or reckless statements.  They maintain that section 44941 applies only where a voluntary disclosure forms the basis of the claim being asserted.

Acknowledging that there are no cases on point, plaintiffs cite to cases construing other statutory immunities, namely, Civil Code section 47 and the state and federal public entity immunities for negligent misrepresentation: Government Code section 818.8 and 28 United States Code section 2680.  The facts of these cases bear little, if any, resemblance to the facts before us.

Plaintiffs first cite to two Supreme Court cases construing the litigation privilege under Civil Code section 47.  In *Rusheen v. Cohen* (2006) 37 Cal.4th 1048 (*Rusheen*), our high court held that a claim for abuse of process was barred by the litigation privilege where the action was based on the filing of allegedly false declarations of service used to obtain a default judgment.  (*Id.* at p. 1052.)  In so ruling, the court stated: "Because the litigation privilege protects only publications and communications, a 'threshold issue in determining the applicability' of the privilege is whether the defendant's conduct was communicative or noncommunicative.  [Citation.]  The

50

distinction between communicative and noncommunicative conduct hinges on the gravamen of the action. [Citations.] That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Id.* at p. 1058.)

In *Ribas v. Clark* (1985) 38 Cal.3d 355 (*Ribas*), the plaintiff and his wife, who at the time was not represented by counsel, began divorce proceedings that ultimately resulted in a court-approved property settlement agreement. (*Id.* at p. 365.) After asking her attorney to listen in on an extension telephone while she spoke to her husband, she filed an action to set aside the dissolution decree alleging the settlement agreement had been procured by fraud. At the arbitration hearing, her attorney testified regarding the phone call. The plaintiff later brought an action against the wife's attorney for violation of statutory eavesdropping laws, as well as claims for common law invasion of privacy and intentional infliction of emotional distress. The trial court sustained the attorney's demurrer on the ground that the attorney was immune from liability pursuant to the litigation privilege. The *Ribas* court reversed in part, holding that the husband could sue the attorney for the statutory civil award, but that his action was barred insofar as it was based on "his common law right to privacy, because his alleged injury stems solely from [the] defendant's testimony at the arbitration proceeding." (*Id.* at p. 364.)

*Rusheen* and *Ribas* are distinguishable from the present case. As we have already discussed, the section 44941 immunity is not limited to acts that are communicative in nature. We also note that the *Rusheen* court itself observed that if "the gravamen" of the action is based on a communicative act to which the litigation privilege applies, "the litigation privilege extends to noncommunicative acts *that are necessarily related to the communicative*

51

*conduct,* which in this case included acts necessary to enforce the judgment and carry out the directive of the writ [(i.e., the act of levying on the writ)]." (*Rusheen, supra*, 37 Cal.4th at p. 1065, italics added.)  In the present case, the flight crew's noncommunicative acts following Phase 1 also were also "necessarily related to the communicative conduct" of reporting the perceived security threat.

The public entity immunity cases plaintiffs rely on are also unavailing. In *Jopson v. Feather River Air Quality Management Dist.* (2003) 108 Cal.App.4th 492 (*Jopson*), the plaintiff sued an air quality management district for negligence after it issued him emission reduction credits (ERCs) at a certain value.  (*Id.* at pp. 494–495.)  While a sale of the plaintiff's ERCs was pending, the district notified him that it had made a miscalculation, reducing the ERCs' value.  (*Ibid.*)  The appellate court observed that the relevant immunity statute, Government Code section 818.8 "grants public entities immunity for negligent misrepresentation but not for negligence." (*Jopson*, at p. 495.)  The court held that, although the plaintiff styled his cause of action as "negligence," his damages were "financial or commercial" ones caused by reliance on misinformation communicated by a public entity— a theory barred by Government Code section 818.8.  (*Jopson*, at pp. 501–502.)

Section 2680(h) of title 28 of the United States Code provides an analogous federal governmental immunity for, among other things, "Any claim arising out of . . . misrepresentation, deceit, or interference with contract rights."  This immunity was addressed in *Guild v. United States* (9th Cir. 1982) 685 F.2d 324 (*Guild*), a case noted by the court in *Jopson.*  (*Jopson, supra*, 108 Cal.App.4th at p. 497.)  *Guild* involved a homeowners association suing a federal agency that had recommended the site location and prepared the construction plans for a dam and reservoir that failed.  (685 F.2d at

pp. 324–325.)  The Ninth Circuit found that this immunity did not shield the government from liability.  The court explained, "The Government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved.  It is not liable, however, for injuries resulting from commercial decisions made in reliance on government misrepresentations." (*Id*. at p. 325.)  Applying that rule to the facts of the case, the court held that "[t]he misrepresentation exception does not apply on these facts because the essence of the complaint is one for failure to take due care in the performance of a voluntary task." (*Id*. at p. 326.)  In other words, "the essence of the complaint" was not "reliance upon misinformation communicated by the Government." (*Ibid*.)

Here, plaintiffs contend that "far from basing their theory of liability on [Southwest's] disclosure to law enforcement, the gravamen of [their] single claim for wrongful death . . . was based on [Southwest's] negligence in failing to identify [Ilczyszyn's] medical emergency as well as providing him timely, lifesaving aid."  However, plaintiffs' complaint specifically alleged that the flight crew was aware Ilczyszyn was experiencing a medical emergency but decided to treat him as a disruptive passenger, leaving him unattended and delaying medical treatment *by falsely reporting to law enforcement personnel* that he had barricaded himself in the lavatory.  Thus, the context for a potential application of section 44941 was essentially "baked into" their own allegations.  Moreover, as we have already discussed, entitlement to section 44941 immunity does not turn on whether an act was communicative.  Rather, it turns on whether the circumstances underlying the alleged injury arise from the decision to declare a security threat.

In any event, the trial court allowed plaintiffs to present their theory that Southwest was negligent in failing to identify Ilczyszyn's medical

53

emergency and provide medical treatment, the same noncommunicative conduct that plaintiffs describe as the gravamen of their case. The court applied section 44941 to post-Phase 1 conduct only.[24] While the court thus restricted the evidentiary timeline within which plaintiffs could prove their case, as we have already held, the court did not err in doing so. Moreover, the jury *agreed* with plaintiffs that the flight crew was negligent in failing to provide Ilczyszyn with immediate medical treatment but determined that the failure to provide aid did not cause his death, a conclusion that is supported by substantial evidence based on the expert medical testimony offered at trial, as detailed above.

### G. *Civil Code Section 47, Subdivision (b)*

Finally, plaintiffs assert that the trial court erroneously relied on Civil Code section 47, subdivision (b) as an alternative ground to bar testimony regarding the pilots' disclosure of the threat to Southwest's ground operations personnel and the flight attendants' discussions with the sheriff's deputies at the arrival gate. Because we have concluded that the testimony was properly excluded under section 44941, we need not address this assertion.

### III.

### DISPOSITION

The judgment is affirmed. Southwest is entitled to its costs on appeal.

---

[24] Southwest broadly asserts that the trial court went too far in allowing plaintiffs to present their case at all, arguing that section 44941 "should [have] preclude[d] all liability, even in Phase 1, foreclosing any negligence finding." Given our conclusion that the judgment must be affirmed, we do not address this argument.

EAST, J.[*]


WE CONCUR:


MARGULIES, ACTING P. J.


BANKE, J.


A158352
*Ilczyszyn v. Southwest Airlines Co.*

---

[*] Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/29/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KELLY ILCZYSZYN et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>        Defendant and Respondent. | A158352<br><br>(Alameda County<br>Super. Ct. No. RG15766954)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION AND<br>DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on June 6, 2022, was not certified for publication in the Official Reports.  IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in rule 8.1105(c) of the California Rules of Court; and ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

Appellants' petition for rehearing is denied.

There is no change in the judgment.

Dated:

_____
MARGULIES, ACTING P.J.

Trial Court:      Alameda County Superior Court

Trial Judge:      Hon. Paul D. Herbert

Counsel:

Balaban & Spielberger, Andrew J. Spielberger, Daniel K. Balaban; Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy; Greene, Broillet & Wheeler, Browne Greene; Gillin, Jacobson, Ellis, Larsen & Lucey, Luke Ellis; Kellogg, Hansen, Todd, Figel & Fredrick and Aaron M. Panner for Plaintiffs and Appellants.

The Ryan Law Group, Timothy J. Ryan, Rebekka R. Martorano; Sidley Austin, Jonathan F. Cohn, Joshua J. Fougere; Ryan Law Partners, Andrew B. Ryan; Coddington, Hicks & Danforth and Richard G. Grotch for Defendant and Respondent.